CHARLES J. RILEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59871.   Filed February 28, 1961.

*Alvin N. Biener, Esq.*, for the petitioner.
*John M. Doukas, Esq.*, for the respondent.

KERN, *Judge:* The respondent determined deficiencies in the petitioner's income tax liability in the amounts of $7,549.34 and $10,150.31 for the years ended December 31, 1951 and 1953, respectively. Further, respondent determined an addition to tax in the amount of $1,206.25 for the year 1953, under section 294(d)(1)(A) of the Internal Revenue Code of 1939, for failure to file a declaration of estimated tax on time.

The issues presented for decision are:

(1) Whether respondent erred in determining that petitioner realized a total net profit of $25,761.08 (including an additional unreported profit of $15,052.79) during 1951 as a building contractor for the construction of the Manning Gardens apartments.

(2) Whether respondent erred in determining that petitioner realized a total gain of $27,483.39 in 1953 (including an additional unreported gain of $9,843.42) upon the sale of 500 shares of the common stock of Manning Gardens, Inc., and that such gain is taxable to

petitioner as ordinary income from the sale of stock of a collapsible corporation under section 117(m) of the Internal Revenue Code of 1939 rather than as a long-term capital gain.

(3) Whether respondent erred in determining an addition to tax for 1953 for failure to file a timely declaration of estimated tax for that year.

It is stipulated that for the taxable year 1951 petitioner is entitled to a deduction of $1,046.57 for interest paid during 1951 on additional taxes for the years 1947, 1948, and 1950.

FINDINGS OF FACT.

Some of the facts have been stipulated. We incorporate herein by this reference the stipulation of facts and exhibits attached thereto and identified therein.

Charles J. Riley, sometimes hereinafter referred to as petitioner, resides in Providence, Rhode Island. During the taxable years involved herein petitioner was unmarried and had no dependents.

Petitioner timely filed his Federal income tax returns for the taxable years 1951 and 1953 with the then collector of internal revenue and the district director of internal revenue, respectively, for the district of Rhode Island. Petitioner and the Commissioner of Internal Revenue duly executed Form 872 for the taxable year 1951, which extended the period of limitation upon assessment of income and profits taxes to June 30, 1956. The notice of deficiency, from which this proceeding was initiated, was mailed to petitioner on August 10, 1955.

Petitioner majored in accounting as a student of business administration at Boston University. He worked as an accountant or as an auditor for a number of years prior to 1922. Thereafter until 1953 petitioner had numerous occupations at various times including work as an employee of the State of Rhode Island, operator of a tavern, shipyard worker during World War II, builder of small homes for sale, building contractor, real estate developer, corporate officer, and manager of Manning Gardens apartments.

From 1933 to 1936, inclusive, petitioner was employed by the State of Rhode Island. During the period 1935–1936 petitioner was engaged in assembling records and auditing vouchers for payments to architects and contractors. Petitioner was dismissed from that job. On June 7, 1937, petitioner was indicted on a charge that he falsely and fraudulently did make, forge, and counterfeit a voucher, dated December 18, 1936, for the payment of $7,440 with intent to defraud the State of Rhode Island. Petitioner was tried by a jury and found guilty on May 24, 1938, and was sentenced to 1 year in jail and fined. Petitioner's appeal to the Supreme Court of Rhode Island was not

resolved until January 11, 1952, and upon remand the lower court suspended sentence and placed petitioner on probation for 3 years.

During 1947 petitioner was engaged in building small houses for sale to veterans in a development known as Cole Farm Plat in the city of Warwick, Rhode Island. That project was completed in December 1947.

In or about March 1948 petitioner became interested in constructing an apartment house project under the provisions of section 608 of the National Housing Act, and began seeking a suitable site with appropriate zoning. On or about October 6, 1948, petitioner purchased certain real estate on East Manning Street, Providence, Rhode Island, as a site for the construction of an apartment house. Petitioner then employed a New York firm of architects which inspected the building site and held conferences with the necessary officials so that the plans would conform to the requirements of both the Federal Housing Administration and the Providence building code.

On April 26, 1949, pursuant to the provisions of section 608 of the National Housing Act, the Federal Housing Administration (hereinafter referred to as FHA) completed its "Project Analysis" on the petitioner's proposed construction of the Manning Gardens apartment project and determined a maximum insurable mortgage thereon in the amount of $296,000.

In its "Project Analysis" for Manning Gardens, the FHA's estimated replacement cost of the property as of December 31, 1947, and also its estimated present replacement cost of the property were as follows:

| | | Replacement cost of property— | |
| --- | --- | --- | --- |
| | | As of Dec. 31, 1947 | Present |
| 1. | Improvements to land | $8,270 | $8,585 |
| 2. | Structures (dwellings) | 253,756 | 263,424 |
| 3. | Fees (builder 5 percent—architect 5 percent) | 26,857 | 27,880 |
| 4. | Carrying charges, and financing | 11,768 | 11,768 |
| 5. | Legal and organization | 2,800 | 2,800 |
| 6. | Fair market price of land | 25,653 | 25,653 |
| | Total estimate of replacement cost | 329,104 | 340,110 |

The FHA's determination of the maximum amount of the insurable mortgage was based upon lowest of 5 amounts, namely, $296,193 representing 90 percent of the total estimated replacement cost of $329,104 of the property as of December 31, 1947; $311,657 representing the total present costs for all physical improvements, carrying charges, and financing (the first four items in the above tabulation); $318,916 representing "Amount based on limitation as to debt service ratio" (net income, after operating expenses and taxes, $21,028 $\times 91\% = \$19,135 \div 6\%$ total debt service items); $299,700 representing

"Amount based on limitation per unit" (37 units×$8,100); and $296,000 representing "Mortgage amount stated in application." The FHA's estimated net income, after operating expenses and taxes, in the amount of $21,028 was based on 93 percent occupancy.

Under the Administrative Rules and Regulations for Rental Housing Insurance under section 608 of the National Housing Act, the FHA would not insure a mortgage in excess of $200,000 unless the mortgagor was a corporation or a trust.

On May 23, 1949, Manning Gardens, Inc. (sometimes hereinafter referred to as the corporation), was incorporated under the laws of the State of Rhode Island for the purpose, *inter alia*, of obtaining an FHA-insured mortgage and the construction and operation of the proposed Manning Gardens apartment project. The corporation's articles of association authorized the following total capital stock:

(a) 100 shares of $1-par-value preferred stock, and
(b) 500 shares of no-par-value common stock, which was the sole voting stock except as specially provided upon the happening of certain events constituting a default by the corporation.

At all times material herein the corporation's authorized 100 shares of preferred stock were issued to the Federal Housing Commissioner and its authorized 500 shares of common stock were issued to and owned by the petitioner until his sale thereof on or about June 23, 1953. Also, at all times material herein, the corporation's board of directors consisted of the petitioner, his attorney, Peter W. McKiernan, and Lena Crowley. The petitioner was president and treasurer of the corporation and he kept its books and records and filed its income tax returns. McKiernan was secretary of the corporation and he prepared the corporate minutes.

The first meeting of the board of directors of Manning Gardens, Inc., was held on May 31, 1949, at which the corporate officers were elected and several corporate resolutions were adopted. One resolution stated that petitioner had spent the sum of $20,000 to purchase the East Manning Street property and to secure a commitment for an FHA-insured mortgage loan thereon, and in addition had spent the sum of $16,000 to meet certain requirements of such loan; and authorized the corporation to issue 500 shares of fully paid nonassessable common stock to Charles J. Riley for a conveyance of the said land and in satisfaction of said sums of money. Another resolution stated that the corporation had acquired the East Manning Street property upon which a commitment had been made for a loan of $296,000; and authorized the corporation to take over the commitment for the mortgage loan and to execute the documents necessary to effectuate the loan, to erect the proposed apartment house, and to enter into a contract with petitioner to erect said apartment house for the sum of $272,009.

It is stipulated herein that the petitioner's actual cost for the above-mentioned 500 shares of common stock of Manning Gardens, Inc., was $26,156.58 computed as follows:

| | |
|---|---|
| Cash | $11,000.00 |
| Land at cost | 15,156.58 |
| Total | 26,156.58 |

The difference between the stipulated actual cost of $26,156.58 for the 500 shares of common stock and the sums totaling $36,000 in the corporate records as the amount paid in for such stock, as mentioned in the next preceding paragraph, was intended to reflect so-called book value of the assets paid in.

On July 12, 1949, Manning Gardens, Inc., entered into a building loan agreement with the Worcester Federal Savings and Loan Association, Worcester, Massachusetts, for the financing of the construction of the Manning Gardens apartments. That agreement was the usual construction mortgage agreement, FHA Form No. 2441-W, required for the insurance of all loans under section 608 of the National Housing Act, and it provided for a construction mortgage loan of $296,000 to be evidenced by a "Note and Mortgage" which, upon execution, was to be endorsed for insurance by the Federal Housing Commissioner. The note was dated July 12, 1949, bearing interest at the rate of 4 percent per annum, and was due and payable on April 1, 1983.

Attached to the building loan agreement and made a part thereof was a schedule, FHA Form 2536-W, entitled "Trade Payment Breakdown" with payments totaling $272,009 for the total estimated cost of actual onsite construction, exclusive of fees. The schedule stated that the contractor's fee at the rate of 5 percent and in the sum of $13,600 was to be paid by means other than cash and thus was not included in the estimated cost figures totaling $272,009.

At the time of the closing of the building loan agreement, there was a waiver of the execution of a written contract between Manning Gardens, Inc., and the petitioner as the building contractor. It was orally agreed that petitioner would receive from the corporation the sum of $272,009 for the actual construction of the apartment house project pursuant to the corporate resolution of May 31, 1949, and also based upon the estimated cost as set out in the above-mentioned "Trade Payment Breakdown." The petitioner anticipated that if he was successful in constructing the apartments for less than the estimated cost of $272,009 he would derive some profit out of the payment in that amount.

The petitioner, doing business as an individual and pursuant to his contract with Manning Gardens, Inc., commenced construction work on the apartment house project sometime during July 1949.

He elected to report the net profit on the entire project on a completed contract basis pursuant to the provisions of Regulations 111, section 29.42–4.

Manning Gardens, Inc., received construction mortgage advances from the Worcester Federal Savings and Loan Association under the building loan agreement on the following dates and in the following amounts:

| | | | |
|---|---|---|---|
| Dec. 15, 1949 | $47,189.00 | July 19, 1950 | $27,534.71 |
| Feb. 9, 1950 | 39,226.70 | Sept. 20, 1950 | 48,512.60 |
| May 23, 1950 | 32,495.42 | Feb. 27, 1951 | 77,566.97 |
| June 22, 1950 | 23,474.60 | | |
| | | Total | 296,000.00 |

Some of the checks for those advances were deposited to the account of Manning Gardens, Inc., and immediately transferred to petitioner's checking account, and the balance of the checks for those advances were endorsed and deposited directly to petitioner's checking account. The total amount of $296,000, construction mortgage money, was deposited to petitioner's personal checking account, out of which he paid all bills for the total construction costs including such items as the architect's fee, insurance, and carrying charges during the period of construction.

From time to time during the construction of the Manning Gardens apartments, certain revisions and modifications were made in the original plans and specifications, consisting of additions and improvements which did not require prior approval by the FHA because they did not involve any increase in the FHA mortgage loan commitment. The petitioner constructed a total of 38 units, put in soundproofing, put up a multiple-antenna system, and in some instances used a better grade of materials than called for by the original specifications. The petitioner received from Manning Gardens, Inc., reimbursements in the total amount of $21,097.81 for the additional costs of construction.

The parties have stipulated that during the period from December 6, 1949, to November 10, 1951, petitioner received from Manning Gardens, Inc., the total sum of $306,197.36 accounted for as follows:

| | |
|---|---|
| Total moneys received by petitioner from Manning Gardens, Inc., from Dec. 6, 1949 to Nov. 10, 1951 | $306,197.36 |
| Less: Corporate reimbursements to petitioner for additional costs of construction | 21,097.81 |
| Total receipts | 285,099.55 |
| Total costs—Less: Audit adjustments agreed to by petitioner | 259,338.47 |
| | 25,761.08 |

During the period of construction the west wing of the Manning Gardens apartments was completed and about 12 units were rented to occupants sometime in 1950. The apartments were substantially

completed for occupancy sometime during the summer of 1951, and the entire project was actually completed on or about December 31, 1951. The Federal income tax return of the Manning Gardens, Inc., for the calendar year 1951 reported a total cost of $308,849.33 as a proper basis for depreciation, at the end of that taxable year, as follows:

| | |
|---|---|
| Apartment building | $274,126.33 |
| Equipment and fixtures | 32,073.00 |
| Building furnishings | 2,650.00 |
| | 308,849.33 |

From the time some units of the partially completed project were rented in 1950 until petitioner sold his stock in the corporation in June 1953, he was the manager of the Manning Gardens apartments. In that capacity petitioner leased the apartments, collected the rents, and generally supervised the operation of the building. For such services petitioner was paid compensation by the corporation in the amounts of $4,400 for 1951, $1,105 for 1952, and $300 for 1953. After the project was completed the apartment units were more or less fully occupied. On its Federal income tax returns for the years 1950 to 1953, inclusive, Manning Gardens, Inc., reported total income (primarily gross rentals) and net income (or loss), as follows:

| Taxable year | Total income | Net income |
|---|---|---|
| 1950 | $8,581.87 | $602.85 |
| 1951 | 42,077.19 | 1,361.45 |
| 1952 | 44,098.29 | (10.14) |
| 1953 | 44,598.12 | 1,729.49 |

During the period from the summer of 1951 up to the spring of 1953, J. Benjamin Nevin, a real estate broker, unsuccessfully endeavored to interest petitioner in listing the Manning Gardens apartments for sale. In 1952, because of a doctor's advice that petitioner needed more physical activity than managing the Manning Gardens apartments and in order to return to construction business, petitioner started looking for a piece of land suitable for development. After a period of negotiations with Nevin and on or about June 18, 1952, petitioner executed a contract with the Mayflower Land Company to purchase for $50,000 a tract of approximately 30 acres of land located in East Providence, Rhode Island. Nevin was president and principal stockholder of the Mayflower Land Company. In August 1952 the petitioner and three other individuals organized two corporations, the Kent Gardens, Inc., to hold title to the land, and the Trail Developers, Inc., to do the development and construction work. Petitioner owned 49 percent of the stock and was an officer of both corporations. The petitioner loaned $10,000 to Kent

Gardens, Inc., which took title to the property in September 1952, and the terms of settlement were a $10,000 cash payment and a $40,000 mortgage note payable in 5 years.

In April or May 1953, and because of his increased involvement in this development and construction work, petitioner gave a listing to Nevin for the sale of his interest in the Manning Gardens apartments and Nevin obtained a purchaser.

On or about June 23, 1953, the petitioner sold 500 shares of Manning Gardens, Inc., common stock to Gibson Realty Co., Inc. It has been stipulated that on that sale petitioner's gross receipts were $58,750 and his net receipts were $53,639.97 and, further, that petitioner's actual cost basis for the stock was $26,156.58. Such stock had been owned continuously by petitioner from date of issuance in May 1949 to the date of sale thereof in June 1953, and throughout that period no dividends were declared or paid thereon.

Sometime in January 1954 petitioner filed a declaration of estimated tax for 1953 accompanied by his check dated January 14, 1954, payable to the order of the director of internal revenue in the sum of $1,500 and bearing the following notation: "1953 Estimated Income Tax." The stamped endorsement on that check by the director of internal revenue is dated January 27, 1954.

In his income tax return for the year 1951 the petitioner reported that as building contractor for the construction of the Manning Gardens apartments, on a completed contract basis, the total business receipts amounted to $272,009, the total business expense amounted to $261,300.71, and the net profit amounted to $10,708.29. In his deficiency notice, with respect to the year 1951, the respondent determined that petitioner's total receipts as adjusted amounted to $285,099.55, that total expense as adjusted amounted to $259,338.47, and that the net profit as corrected amounted to $25,761.08.

In his income tax return for the year 1953, filed on March 15, 1954, petitioner reported a long-term capital gain of $17,639.97 on the sale of 500 shares of Manning Gardens, Inc., common stock, on the basis of a gross sales price of $58,750, expense of sale $5,000, and a cost basis of $36,110.03. In his deficiency notice with respect to the year 1953 the respondent determined that on the sale of such stock the gross sales price was $58,750, the expense of sale was $5,110.03, the cost basis was $26,156.58, and the gain realized by petitioner was $27,483.39 taxable as ordinary income pursuant to section 117(m) of the 1939 Internal Revenue Code. Further, for the taxable year 1953, the respondent imposed an estimated addition to tax under section 294(d)(1)(A) for failure to file a declaration of estimated tax on time.

*Ultimate Findings of Fact.*

The petitioner realized a net profit in the amount of $25,761.08 as the building contractor for the construction of the Manning Gardens apartment project, which was completed on or about December 31, 1951.

The petitioner realized a gain in the amount of $27,483.39 upon the sale of his Manning Gardens, Inc., stock in June 1953. Manning Gardens, Inc., was not formed or availed of principally for the construction of property with a view to the realization by its shareholder of gain attributable to the property through a sale or exchange of stock by its shareholder before the realization by said corporation of a substantial part of the net income to be derived from such property.

Petitioner's failure to file a timely declaration of estimated tax for the year 1953 was not due to reasonable cause.

### OPINION.

The first issue involves the question of whether petitioner realized a profit of $25,761.08 in 1951, on a completed contract basis, as the building contractor for the construction of the Manning Gardens apartments as determined by respondent.

The petitioner makes two contentions with respect to the amount of $25,761.08 which he now concedes was received by him from Manning Gardens, Inc., in 1951: First, that only $12,670.53 thereof constituted petitioner's building contractor's profit taxable as ordinary income, and second, that the remaining $13,090.55 represented a partial return of petitioner's investment in the corporation which, pursuant to section 115 of the 1939 Internal Revenue Code, is taxable as a dividend to the extent of the corporation's earnings and profits and the remainder applied to reduce the basis of his stock of Manning Gardens, Inc.

Petitioner contends that, based upon his testimony as to his oral contract with the corporation, the total contract price for the construction of the Manning Gardens apartments was $272,009 including a building contractor's 5 percent fee in the sum of $13,600, and, further, that the "Trade Payment Breakdown" schedule attached to the building loan agreement substantiates that contention. The petitioner takes the position that the only modification of the contract price was the reimbursement of certain expenses, and that thus he received the contract price of $272,009 plus the reimbursed expenses of $21,097.81 or a total of $293,106.81 as the building contractor, and further, that the amount of $293,106.81 less $21,097.81 reimbursement less the stipulated total costs of $259,338.47 resulted in a building contractor's profit of $12,670.53. The petitioner further contends that the difference between the stipulated figure of $306,197.36, total mon-

eys received by him from the corporation during the period from December 6, 1949, to November 10, 1951, and the above contended-for amount of $293,106.81 as the total contract receipts resulted in the amount of $13,090.55 withdrawn from the corporation by petitioner as a partial return of his investment.

The record herein does not support the petitioner's contentions. The corporate resolution of May 31, 1949, at the first meeting of the board of directors, merely authorized Manning Gardens, Inc., to enter into a contract with petitioner to erect the apartment house for the sum of $272,009, which was evidently based upon estimated cost of construction. The "Trade Payment Breakdown" schedule showed amounts totaling $272,009 for the total estimated cost of actual on-site construction, exclusive of fees. That schedule contained a statement that a contractor's fee at the rate of 5 percent and in the amount of $13,600 was to be paid by means other than cash and therefore was excluded from the estimated costs. At the time of the closing of the building loan agreement on July 12, 1949, the petitioner and Manning Gardens, Inc., entered into an oral agreement for the construction of the apartment house project by petitioner. However, so far as this record discloses, the terms of that agreement were nebulous. Petitioner's testimony is to the effect that, since a written contract was waived, both he and the corporation simply agreed to abide by the figure of $272,009 representing the estimated cost of construction. During the construction the entire mortgage loan proceeds in the amount of $296,000 were deposited in petitioner's personal checking account and remained subject to his control in making disbursements in payment of all construction costs. During construction various modifications in the plans and specifications were made as desired by petitioner without formal corporate approval. Upon completion of construction there was no formal corporate action as to any payments to petitioner, either as building contractor or as investor. In short, at all times material here, petitioner was in control of the corporation and its funds, and upon completion of the construction on or about December 31, 1951, he received and retained the net amount of $25,761.08 in connection with such construction job.

On this record we conclude and have found as an ultimate fact that petitioner realized a net profit of $25,761.08 in 1951 as the building contractor for the construction of the Manning Gardens apartments. The instant case is clearly distinguished on the facts from *George M. Gross*, 23 T.C. 756, affd. 236 F. 2d 612; *Thomas Wilson*, 25 T.C. 1058; and *W. H. Weaver*, 25 T.C. 1067, cited and relied on by petitioner. On this issue the respondent's determination is sustained.

The second issue involves the question of whether Manning Gardens, Inc., was a collapsible corporation within the meaning of section

117(m)[1] of the 1939 Internal Revenue Code and, therefore, that the gain in the amount of $27,483.39 realized by petitioner upon the sale of 500 shares of common stock in that corporation in 1953 was attributable to property which is not a capital asset.

The respondent's determination that petitioner's gain from the sale of his Manning Gardens, Inc., stock is taxable as ordinary income within the purview of section 117(m) is presumptively correct and the petitioner has the burden of proof to establish error in that determination.

In the instant case there is no question but that Manning Gardens, Inc., was formed primarily for the construction of the apartment building financed under an FHA-insured mortgage, that the sale of the stock occurred prior to the realization of a substantial part of the net income to be derived from such property, and that petitioner as a shareholder realized gain attributable to such property. However, the petitioner contends that the corporation was neither formed nor availed of with the requisite statutory "view" or intent to the action proscribed by section 117(m)(2)(A).

The petitioner contends that prior to and during construction and for almost a year and a half after completion of construction his sole intention was to provide himself with a long-term investment and an income therefrom. Petitioner further contends that the sale of his stock was attributable solely to circumstances which arose after completion of construction and that, therefore, Manning Gardens, Inc., is not to be characterized as a "collapsible" corporation. Petitioner cites and relies on Regulations 111, section 29.117–11(b).[2]

---

[1] SEC. 117.  CAPITAL GAINS AND LOSSES.

    (m) COLLAPSIBLE CORPORATIONS.—

       (1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3) be considered as gain from the sale or exchange of property which is not a capital asset.

       (2) DEFINITIONS.—

         (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

           (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

           (ii) the realization by such shareholders of gain attributable to such property.

[2] Regs. 111.

SEC. 29.117–11(b).  *Determination of collapsible corporation.*—

    \*        \*        \*        \*        \*        \*        \*

A corporation is formed or availed of with a view to the action described in section 117(m)(2)(A) if the requisite view existed at any time during the \* \* \* construction \* \* \* referred to in that section. Thus, if the sale \* \* \* is attributable solely to circumstances which arose after the \* \* \* construction \* \* \* (other than circumstances

Petitioner's evasive attitude on the witness stand and his prior record do not commend to us the credibility of his testimony. However, upon the question of whether the sale here in question was "attributable solely to circumstances which arose after the * * * construction," his testimony is not only uncontradicted by any other testimony but it is also consistent with other facts of record and is to some extent corroborated by the testimony of two disinterested witnesses, the real estate broker who unsucccessfully tried to interest petitioner in selling the property prior to 1953, and the doctor who advised him to change the form of his business activity. Under the circumstances, we feel obliged to conclude that the sale here in question was attributable solely to circumstances which arose at a time substantially after the construction of the apartment building had been completed (not reasonably to be anticipated at the time of construction), and therefore that the gain arising therefrom was not taxable to petitioner as ordinary income.

The third issue involves an addition to tax for petitioner's failure to file a timely declaration of estimated tax for the year 1953. On this issue the only testimony adduced was that of petitioner upon whose credibility we have already commented. At one point in his testimony he stated categorically that he had consulted with both his attorney and his accountant on the matter while at another point in his testimony he stated that he did not "remember which one of them [he] called in reference to it." Neither the accountant nor the lawyer was called as a witness to corroborate the self-serving statements of petitioner.

On this issue we conclude and have found as an ultimate fact that petitioner's failure to file a timely declaration of estimated tax for the year 1953 was not due to reasonable cause.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: For present purposes, I assume that the Commissioner's regulation is a permissible interpretation of the statute. This deficiency must then have included an implicit determination by respondent that the requisite "view" existed prior to the

---

which reasonably could be anticipated at the time of such * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale * * * is attributable to circumstances present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

Respondent makes no contention that these regulations are invalid, although he quotes from *Burge* v. *Commissioner*, 253 F. 2d 765, and *Glickman* v. *Commissioner*, 256 F. 2d 108, in his brief. Since these quoted regulations have not been amended or rescinded by the Commissioner, it is to be assumed that his counsel in this case raises no argument as to their validity and we consider no such argument to be properly before us.

completion of construction. The burden of proving the contrary rests upon petitioner. *Rose Sidney*, 30 T.C. 1155 (1958), affd. 273 F. 2d 928 (C.A. 2, 1960). This view need not be the "principal" one. *Max Mintz*, 32 T.C. 723 (1959), affd. 284 F. 2d 554 (C.A. 2, 1960). I find nothing in the record, including the Court's Findings of Fact, which even remotely sustains the burden of proving that there was no such view, either "unconditionally" or at least "conditionally, or as a recognized possibility." Sec. 29.117–11(*b*), Regs. 111, 1953–1 C.B. 187, 190. Certainly, the concededly unreliable testimony of petitioner, with no impartial evidence to support it, cannot justify the ultimate finding, which is really a legal conclusion, that the corporation was not "availed of" with a "view to * * * [the realization of gain through a] sale or * * * distribution * * * prior to the realization * * * of a substantial part of the net income to be derived from such property." This is the only test which the statute invokes. I, accordingly, respectfully dissent.

TIETJENS, RAUM, PIERCE, and MULRONEY, *JJ.*, agree with this dissent.

---

MULRONEY, *J.*, dissenting: I agree with Judge Opper but I would like to add that my disagreement with the majority opinion is more than a conviction that the evidence does not justify the ultimate finding that the requisite view was not present.

Petitioner's burden, under the regulation upon which he relies, was to prove the existence of postconstruction circumstances, which could not reasonably be anticipated at the time or during construction, to which the sale of his stock was solely attributable. The only circumstance to which it could be said the sale of stock was attributable was the circumstance of petitioner's need for money in his development and construction business. He had been in that business rather continuously since 1947 when he started building houses for sale to veterans in Warwick, Rhode Island. He was, one could say, "between" construction jobs from December 1947 when the Warwick job was completed, and March 1948 when the Manning Gardens job was started, and from December 31, 1951, when the Manning job was completed until sometime before June 18, 1952, when the Mayflower job was started. The circumstance that his development and construction business would need money is not a circumstance that could not reasonably have been anticipated. I rather think any builder always anticipates his *next* job will necessitate his raising funds.

As I see it, the circumstance of the doctor's advice that he needed more physical activity than apartment managing, has nothing to do with this case. This wholesome advice could have been followed by petitioner taking up golf or entering a dancing school. In any event,

the advice was given less than 6 months after completion of construction and petitioner states that for a year and a half after construction his sole intention was to hold his stock to provide himself with a long-term investment and an income therefrom.

The majority likes to believe petitioner's story that the doctor's advice caused him to return to the development and construction business—if indeed he ever left it. I cannot see how that would make the doctor's advice a circumstance to which the sale of the stock would be solely attributable. Petitioner says, in effect, such advice did not cause him to change his mind about continuing to hold his stock as an investment. The stock sale was not even proximately related to the doctor's advice. It may or may not have prompted petitioner to reenter the construction and development business. When about a year later petitioner makes a business decision to sell his stock to raise needed funds for such business, it can hardly be said the doctor's advice is a circumstance to which the stock sale will be solely attributable. I respectfully dissent.

OPPER, TIETJENS, RAUM and PIERCE, *JJ.*, agree with this dissent.