Louis Kellner and Carol Kellner v. Commissioner. Myron Dubin and Hannah Dubin v. Commissioner.
Kellner v. Commissioner
Docket Nos. 4005-68, 4008-68.
United States Tax Court
T.C. Memo 1971-293; 1971 Tax Ct. Memo LEXIS 39; 30 T.C.M. (CCH) 1240; T.C.M. (RIA) 71293; November 17, 1971, Filed. Martin D. Cohen, 744 Broad St., Newark, N.J., and Morris A. Kaplan, for the petitioners. Steven M. Miller, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: For the years *41 1961 and 1963, respondent determined deficiencies in the Federal income tax of petitioners and additions thereto as follows: Kellner, Dkt.
Addition to Tax
No. 4005-68
Deficiency
Section 6653(a)
1961
$52,569.35
$2,628.47
1963
2,568.20
128.41
Dubin, Dkt.
No. 4008-
1961
45,637.20
2,281.86
1963
252.32 These cases were orally consolidated for trial, briefing, and opinion at the commencement of the trial. Petitioners contended at trial that they were each entitled to an increased basis in Hancar of $15,981.89 for the calendar year 1963. Respondent now concedes that petitioners are correct in this claim. As a result, with respect to Hancar Realty Corporation, petitioners may claim deductions of $11,053.10 each within the provisions of 1241 section 1374, rather than $7,906.28 each as determined in the deficiency notice. [1]
In addition, petitioner Louis Kellner has determined not to contest the disallowance of travel and entertainment expenses to him in 1962 and 1963. Concessions having been made by the parties, the issues for decision are: (1) Whether, *42 upon the liquidation of Tyton Construction Corporation, petitioners realized capital gain within the provisions of section 331(a)(1), or ordinary income within the provisions of section 341(a)(2); (2) Whether the admitted underpayment of tax for the taxable year 1961 is subject to the 5 percent addition to the tax under section 6653(a). Findings of Fact Some of the facts are stipulated. The stipulation of facts and exhibits thereto are incorporated herein by reference. Petitioners Louis Kellner and Carol Kellner are husband and wife who reside in Scarsdale, New York. At all material times, they filed their joint Federal income tax returns with the district director of internal revenue, New York, New York. Petitioners Myron Dubin and Hannah Dubin are husband and wife who reside in Bayside, Queens, New York. At all material times, they filed their joint Federal income tax returns with the district director of internal revenue, Brooklyn, New York. Carol Kellner and Hannah Dubin are parties to this proceeding solely by virtue of having filed joint Federal income tax returns with their respective husbands for the years involved. Consequently, only Louis Kellner and Myron Dubin *43 will hereinafter be referred to as petitioners. Petitioner Louis Kellner was born May 24, 1927. In 1950, he graduated from New York Law School, receiving an L.L.B. degree, and was admitted to practice in the State of New York in 1951. During the taxable years 1961 and 1963, he maintained, and still maintains, an office in Bronx, New York (hereinafter referred to as "the Bronx"). Petitioner Myron Dubin was born November 6, 1929. He received a B.C.E. (Bachelor of Civil Engineering) from the City College of New York in January, 1951, and became licensed as a professional engineer of the State of New York in 1955. After graduating from college, petitioner Myron Dubin became, in turn, an inspector on a construction project and a structural engineer with an architectural engineering firm in New York City. After getting out of law school, petitioner Louis Kellner became a real estate broker in the Bronx and engaged in the construction, development, and selling of real property. On April 9, 1958, petitioners caused Hancar Realty Corporation (hereinafter referred to as "Hancar") to be incorporated under the laws of the State of New York. At all material times, they each owned one-half *44 of the issued and outstanding stock of Hancar. For the taxable year ended April 30, 1963, Hancar elected to be treated as a small business corporation within the meaning of section 1371 and related provisions (subchapters). Petitioners began working together in 1957. They engaged in three separate building projects in the Bronx between 1957 and 1959. For each project, they formed a corporation and, through the corporation, purchased a tract of land. They would then construct houses on the tract and sell them. It was not their custom to build concurrently on the entire tract. Instead, they would first build on a portion of the tract. They then would try to sell those houses before commencing construction on another portion of the tract. As of February 23, 1960, and for some time prior thereto, Havenwood Homes, Inc., a New York corporation (having no relation to petitioners), was the owner of a tract of vacant land located in the Bronx, the legal description of which, for conveyancing purposes, was as follows: BEGINNING at a point on the southerly side of Homer Avenue, distant 90 feet westerly from the corner formed by the intersection of the southerly side of Homer Avenue and *45 the westerly side of Olmstead Avenue; running thence westerly along the southerly side of Homer Avenue 690 feet to the easterly side of Pugsley Avenue; thence southerly along the easterly side of Pugsley Avenue 200 feet to the northerly side of Seward Avenue; thence easterly along the northerly side of Seward Avenue 780 feet to the westerly side of Olmstead Avenue; thence northerly along the westerly side of Olmstead Avenue 118 feet; thence 1242 westerly parallel with the southerly side of Homer Avenue 90 feet; thence northerly parallel with the westerly side of Olmstead Avenue 82 feet to the southerly side of Homer Avenue at point or place of Beginning. The above-described tract of vacant land is hereinafter referred to as "the Homer tract." On February 23, 1960, Hancar and Havenwood Homes, Inc. entered into a written contract, negotiated at arm's length, for the sale of the Homer tract to Hancar for $168,000. subject to a first mortgage of $89,340.72. On March 10, 1960, petitioners formed Tyton Construction Corp. (hereinafter referred to as "Tyton") under the corporation laws of New York. For the taxable year ended February 28, 1961 and the short taxable period ended October 31, 1961, Tyton *46 was a duly electing small business corporation within the meaning of section 1371 and related provisions (subchapter S). At all material times, petitioners each owned onehalf of the issued and outstanding stock of Tyton. On March 21, 1960, Hancar assigned all of its rights under the February 23, 1960 contract to Tyton. On the same date, Havenwood Homes, Inc. conveyed the Homer tract to Tyton by means of a bargain and sale deed. Tyton's basis (cost) for the Homer tract amounted to $172,230.29, comprised of the following: Cost of Land
Amount
Cash
$ 14,586.90
First Mortgage
89,340.72
Second Mortgage
63,659.28
Title Fees and Recording
455.29
Gratuity
25.00
Taxes accrued to date of purchase
413.10
Street Improvement
750.00
Broker's Commission 3,000.00
$172,230.29
At this time, the tract was classified as D-1 under the zoning laws of the City of New York. Property zoned under the D-1 classification was restricted to construction of one and two-family houses. Not more than ten attached (row) houses could be built in one row or group. The maximum permissible floor area ratio was 55 percent of the lot, a very low density use for the lot. The term "density" *47 in this context refers to the number of families which can be housed in buildings permissible by zoning regulations on a given lot. Under such limitations, laying out the Homer tract for construction of 69 houses provided maximum density for the lot. Consequently, it was petitioners' plan and intention that Tyton erect 69 two-family homes on the Homer tract, the land and houses thereupon to be sold as individual units. A "plot plan" prepared in November, 1960 shows that four groups of two-family houses, eight houses to each group, were to be constructed along Homer Avenue; four more such groups along Seward Aveenue; and a single group consisting of only five two-family houses fronting on Olmstead Avenue. The plot plan was used for petitioners' own purposes, as a memorandum of intention, as well as to show prospective buyers where the 69 projected houses were to be built. On October 5, 1960, Tyton filed with the Department of Buildings a set of plans calling for the erection of eight attached (row) two-family brick dwellings along Homer Avenue at the northeasterly section of the Homer tract. On December 12, 1960, the plans were approved by the Department of Buildings and a building *48 permit was duly issued to Tyton. By September, 1961, Tyton had completed construction up to the point of sale of eight two-family dwellings designated (even) numbers 2080 to 2094 Homer Avenue. In late 1956 or early 1957, the City of New York let a contract to an architectural firm for the purpose of conducting land use surveys as the initial step toward the enactment of new zoning regulations for the entire City. On December 21, 1959, proposed new zoning regulations and related maps were published in the City Record. On December 23, 1959, the New York City Planning Commission published dates upon which public hearings on such new regulations were to be held in the various boroughs. Such hearings were duly conducted and, on August 17, 1960, a zoning resolution proposing new regulations was published. Further hearings were held in September, 1960; the resolution was submitted to the Board of Estimate in October, 1960, and was adopted by the Board on December 15, 1960 to become effective one year later, i.e., December 15, 1961. The new resolution changed the classification of the Homer tract from the designation "D-1" to the "R-6." The new R-6 classification permitted a very high *49 density use so that it was possible to erect large 1243 buildings on the property. In the case of the Homer tract, it was possible under the new R-6 classification to erect a 25-story building and to achieve a floor area ratio of 2 1/4 times the lot area. Petitioners first learned of the proposed new regulations in or about May, 1960. On May 1, 1961, Tyton contracted with Modern Interiors for the latter to furnish a model house on the Homer tract and, on June 6, 1961, contracted with Silhouette Realty, Inc., designating the latter as the exclusive selling agent for the 69 two-family houses to be built by Tyton on the Homer tract. On May 31, 1961, Tyton filed with the Department of Buildings plans for the construction of an additional 16 two-family attached houses to be constructed along Homer Avenue immediately to the west of the original eight houses described above. On June 28, 1961, Tyton applied to the New York and Suburban Federal Savings and Loan Association (hereinafter referred to as "Savings") for a construction loan. The application was approved on July 19, 1961. On August 7, 1961, petitioners Myron Dubin and Louis Kellner, as president and secretary, respectively, *50 of Tyton, executed a certificate consenting to borrow $186,000 from Savings. On August 15, 1961, Savings loaned Tyton $186,000. The first advance, in the amount of $105,300, was received by Tyton on August 15, 1961. Subsequently, it received another installment of $32,400, making a total advance by Savings to Tyton of $137,700. Between July, 1961 and November, 1961, Tyton placed frequent ads in various newspapers circulated in the area of the Homer tract publicizing the two-family homes for sale at the Homer tract. The ads were prepared on Tyton's behalf by an advertising firm for a fee of $1,200. Each ad gave the telephone number at the model home and referred to Silhouette as sales representative. The development was advertised as Castle Village and a typical ad read as follows: WHY PAY RENT LIVE AND SAVE Enjoy an Income 2-Family Brick Homes
6 and 5 Room Apartments Balconied Sunken Living Room, finished playroom with bath, 1 block to school THE TRENDEX at CASTLE VILLAGE See our furnished model today featuring 69 homes Model: 2092 Homer Avenue, off Olmstead Avenue * * * In addition to the above-sales promotions, Tyton eventually offered price reductions *51 on the eight houses ranging from $500 to $2,300 from an original projected sales price of $29,500. Despite its efforts, Tyton experienced great difficulty in selling the houses. In their previous ventures, petitioners had been able to sell about 20 houses a year in any location. They had expected comparable success at the Homer tract. However, although customers typically come to buy houses in the months of June, July, and August, Tyton had only one house under contract for sale by September, 1961. In the year 1961, Ronald B. Reiss, a licensed real estate broker, was employed by Allstates Realty Corp. While so employed, Reiss was assigned to make a survey of all vacant land in the Bronx suitable for purchase by 637 Realty Corp. (hereinafter referred to as "637 Realty"). In October, 1961, as part of his survey, Reiss contacted petitioner Louis Kellner to inquire if the unimproved portion of the Homer tract was for sale. As a result of this inquiry, said petitioner attended a conference with representatives of 637 Realty on or about October 13, 1961 in order to discuss the possibility of the sale of the unimproved land. On October 16, 1961, petitioners held a special meeting of stockholders *52 of Tyton and resolved to liquidate the corporation and distribute its assets to themselves. The decision to liquidate was precipitated by Mr. Reiss' proposal to purchase the undeveloped portion of the Homer tract. On October 17, 1961, Tyton conveyed by deed to petitioners the improved section of the Homer tract on which the eight twofamily attached dwellings were located. By a separate deed, also dated October 17, 1961, Tyton conveyed the remaining (unimproved) portion of the Homer tract to petitioners. On October 19, 1961, petitioners conveyed by deed the improved section of the Homer tract to Hancar. In turn, Hancar finished the needed work on the houses and eventually sold them. Said houses were sold by Hancar as follows: 1244 Date Sold
Selling Price
10-31-61
$ 29,600
1-17-62
29,000
2-20-62
30,500
3- 1-62
29,000
6-26-62
28,450
9-13-62
29,000
1-22-63
29,000
5-28-63 29,450
$234,000
On or about October 19, 1961, 637 Realty prepared, signed, and transmitted to Tyton for execution an "Agreement to Purchase" dated October 19, 1961. This document could not be executed by Tyton and never became an operative agreement, since Tyton had distributed *53 said property to petitioners two days before. On November 1, 1961, petitioners granted 637 Realty an option to purchase the land in question; and, on May 10, 1962, the transaction was completed and title was conveyed. On October 17, 1961, the fair market value of that portion of the Homer tract upon which the eight houses had been constructed was $223,000, and the fair market value of that portion of the Homer tract upon which no houses had been constructed was $308,000. In addition, pursuant to the aforementioned liquidation on October 17, 1961, Tyton distributed other miscellaneous assets to petitioners having an aggregate fair market value of $23,133. The assets received by the petitioners as a result of the liquidation of Tyton were subject to liabilities aggregating $350,791.86. This resulted in the receipt by each petitioner, as a liquidating distribution from Tyton, of net assets in the amount of $101,670.57. This amount was correctly shown in the respective notices of deficiency issued by respondent. Petitioners did not report any gain from the aforementioned liquidating distribution on their 1961 income tax returns, believing such gain to be deferrable, under the provisions *54 of section 333, until the year in which petitioners actually disposed of the distributed assets. For reasons which are not material here, the liquidation did not qualify for nonrecognition of gain under section 333; and any gain realized by petitioners is to be recognized in the taxable year 1961, rather than in 1962 as reported by petitioners. For its taxable period ended October 31, 1961, Tyton understated its deductions by $26,058.99, resulting in an increased net operating loss of the same amount. Therefore, in a computation to be made under Rule 50, each petitioner is entitled to deduct an additional loss of $13,029.50 for 1961 pursuant to section 1374 (I.R.C. 1954). As a corollary, the adjusted basis of each petitioner's interest in Tyton is to be decreased by a like amount for the purposes of computing gain upon Tyton's liquidation. Opinion Tyton, a corporation wholly owned by petitioners, acquired the Homer tract in 1960. Its purpose in making this acquisition was to subdivide the tract into 69 individual lots, build two-family houses thereon, and sell the land and houses in individual packages. It planned to build and sell only on small portions of the land at any one *55 time. Initially, eight houses were constructed. However, Tyton experienced great difficulty in selling these houses and built no more homes on the tract. The tract was rezoned by the City of New York in 1960, so that buildings of up to 25 stories could be built on it. As a result, its value became greatly enhanced. In October, 1961, a broker representing 637 Realty contacted petitioner Louis Kellner and inquired whether that part of the Homer tract upon which houses had not yet been constructed was for sale. Petitioner Louis Kellner expressed interest in selling. Consequently, petitioners dissolved Tyton, each realizing taxable gain on the dissolution. However, they did not report any gain from the liquidation on their respective 1961 Federal income tax returns, erroneously believing such gain to be deferrable, under the provisions of section 333, until the year in which they actually disposed of the distributed assets. The vacant land was sold by petitioners to 637 Realty in 1962. The land upon which the eight houses had been constructed was conveyed by petitioners to Hancar, another corporation wholly owned by petitioners. Hancar eventually sold the houses and land. The questions *56 for decision are, first, whether the gain realized by petitioners is taxable as a capital gain under section 1245 331(a)(1), [2] or as ordinary income under section 341(a)(2); [3] and, second, whether the failure by petitioners to report any gain as a result of the liquidation on their Federal income tax returns for 1961 gave rise to an additional tax within the provisions of section 6653(a). *57 As regards the first issue, respondent determined that, at the time of the liquidation, Tyton was a collapsible corporation within the meaning of section 341 and that consequently the gain resulting to the petitioners was ordinary within the provisions of section 341(a). However, petitioners argue that Tyton was not a collapsible corporation. Further, assuming arguendo that Tyton was a collapsible corporation, petitioners claim, in the alternative, that section 341(a) does not apply in this case because of the limitation prescribed in section 341(d)(2). Due to our manner of disposition of the issue, we will not need to discuss this alternative contention of petitioners. Insofar as material herein, section 341 (b)(1) defines a collapsible corporation as "a corporation formed or availed of principally for the * * * construction * * * of property [or] for the purchase of property * * * described in paragraph (3), * * * with a view to * * * a distribution to its shareholders, before the realization by the corporation * * * constructing * * * or purchasing the property of a substantial part of the taxable income to be derived from such property, and * * * the realization by such shareholders *58 of gain attributable to such property." In section 341(b)(3), the purchased property referred to in section 341(b)(1) includes property held by the corporation primarily for sale to its customers in the ordinary course of its trade or its business. [4]
In this case, Tyton was formed to construct and sell houses. Subsequently, it was availed of for the purchase and construction of property. Both the tract and the houses constructed on a part of said tract were property held for sale to customers in the ordinary course of the business of Tyton. Donald J. Lawrie, 36 T.C. 1117 (1961); James E. Kesicki, (34 T.C. 675 (1960); Pennroad Corporation v. Commissioner, 261 F. 2d 325 (C.A. 3, 1958), certiorari denied 359 U.S. 958 (1959), affirming 29 T.C. 914 (1958); Williams v. United States, 329 F. 2d 430 *59 (C.A. 5, 1964). Except for the question of intention, the corporation meets the statutory definition of a collapsible corporation. The only question for decision, therefore, is whether at the time it acquired the property, or at any time thereafter, the corporation was availed of for the proscribed intent, or "view," as the statute terms it. It is clear that the original purpose of Tyton was to build houses which would be sold on an individual basis, any profit therefrom accruing to the corporation. At this time, there was no "view" by Tyton to subsequently distribute the property to its shareholders in order to avoid the realization of ordinary income from the sale of the property by Tyton. It is equally clear that Tyton had no such "view" at the time it acquired the Homer tract. Its original purpose had not changed at that time; rather, it was in the business of building and selling homes. Subsequently, it cannot be said that any gain from the sale of such land was foreseen or foreseeable at the time that the property was acquired by the corporation. Rezoning obviously was not a factor, else 1246 the corporation would never have built the eight houses. Similarly, it is *60 evident from the acts of the parties that there was never any "view" either at the time of the distribution, or at any time prior thereto, to pass on to the stockholders any gain which might be realized as a result of building the eight houses. Indeed, it does not appear that there was any realizable gain to pass on. As part of the same transaction, the eight houses were transferred immediately to another corporation, the stock of which was held by the same shareholders in the same proportion. [5]
On the other hand, it is equally clear that once 637 Realty made its offer to buy the unimproved portion of the tract, petitioners were aware that it could be sold at a substantial profit; and that thereupon Tyton distributed the land to petitioners, its sole stockholders, with a view to the realization by petitioners of the gain which would otherwise accrue as taxable income to Tyton from the sale of the land. If petitioners entertained such intent at the time the property *61 was originally acquired by Tyton, there would be no dispute. However, given the facts of the instant case, the Court is faced with the question whether Tyton is a "collapsible corporation" within the provisions of section 341 where the tax avoidance "view" arose after the Homer tract had been acquired by Tyton, and during a time when eight houses were completed to the point of sale, but before Tyton had undertaken the construction of any additional houses. With respect to the vacant section of the Homer tract, the property sold and producing the gain on liquidation, there had been no construction. The statute is not free from ambiguity. On its face, section 341(b)(1) would appear to reach any case where a corporation holding property (whether manufactured, constructed, produced, or purchased), the sale of which would result in the realization of ordinary income to the corporation, liquidates and distributes such property to its shareholders in order that they might consummate the sale, with the resulting liquidation producing capital gain to the shareholders. However, in his regulations, the respondent has restricted the scope of the statute. As interpreted by the respondent, for *62 section 341 to apply, the proscribed "view" must have existed at the time the property was purchased or during the time the property was being constructed, etc. [6] While courts may have expressed some reservation with respect to the validity of this interpretation of the statute, [7] we are inclined to accept it. *63 It must be remembered that section 341 was added to the Internal Revenue Code upon the recommendation to close what was thought to be a "loophole" in the existing law. [8] It would hardly be proper for this Court to extend the applicability of such provision beyond that contemplated by its proponents. Further, if the application of section 341 were intended to be "automatic," that is, to flow necessarily from the act of the corporation in making a distribution of property to its shareholders to avoid the tax on a proposed sale, Congress could have so provided in simple terms. We must assume, therefore, that for the tax to apply, the proscribed "view" must have existed either at the time that the property was purchased (in the case of a purchase), or at the time that the property was constructed, etc., if the gain realized might be attributable to such activity. 1247 Here, neither condition has been satisfied. As we have already indicated, there was no proscribed "view" at the time the property was purchased. Further, even if we assume that the proscribed "view" was present during the construction *64 of the eight houses, this is not enough. The reason for the "view" was not attributable to the property being constructed, but rather to the unimproved property upon which no construction had taken place. Consequently, we must conclude that, on the facts of the instant case, section 341 does not apply. [9]
The second issue in the case involves the determination by respondent of the 5 percent addition to the tax for petitioners under section 6653(a). Petitioners did not report any gain resulting from the liquidation in 1961 under the erroneous assumption that section 333 allowed deference of such gain until the year in which petitioners actually disposed of such assets. Petitioners reported the gain in 1962, the year in which the sale of the unimproved land by petitioners to 637 Realty was completed. Section 6653(a) provides: (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A *65 or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. In the instant case, there is no evidence that the reliance upon section 333 by petitioners in filing their respective returns was not made in good faith. Conversely, the evidence indicates that the failure to include the gain in 1961 by petitioners was due solely to a misunderstanding of the law. This is not a sufficient reason for an addition to the tax for negligence. Tatem Wofford, 5 T.C. 1152 (1945). Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) General Rule. - (1) Complete liquidations. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. * * * ↩
3. SEC. 341. COLLAPSIBLE CORPORATIONS. (a) Treatment of Gain to Shareholders. - Gain from - (1) the sale or exchange of stock of a collapsible corporation, (2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and (3) a distribution made by a collapsible corporation which, under section 301(c)(3)(A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property, to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.↩
4. Section 341(b)(3) provides in pertinent part as follows: (3) Section 341 Assets. - For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is - * * * (B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business; * * *↩
5. The petitioners presented unrebutted evidence to the effect that at the time of distribution, the cost of the eight houses and land on which they were situated exceeded their accumulated fair market values.↩
6. Section 1.341-2(a)(3), Income Tax Regs. , provides: (3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of. ↩
7. See e. g., Glickman v. Commissioner, 256 F. 2d 108 (C.A. 2, 1958); Burge v. Commissioner, 253 F. 2d 765 (C.A. 4, 1958). But cf. Jacobson v. Commissioner, 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893 (1959); Payne v. Commissioner, 268 F. 2d 617↩ (C.A. 5, 1959).
8. See S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 449↩.
9. This Court has reached a similar result in Maxwell Temkin, 35 T.C. 906 (1961) and Charles J. Riley, 35 T.C. 848↩ (1961).