MAXWELL TEMKIN AND MARY TEMKIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM SHAPIRO AND HELEN SHAPIRO, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71826, 71827. Filed March 13, 1961.

*William P. Balaban*, *Esq.*, and *Abraham L. Wellen*, *CPA*, for the petitioners.

*Sheldon Seevak*, *Esq.*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined a deficiency in the income tax of each of the petitioners for the year 1951 in the amount of $1,931.91 with respect to Maxwell and Mary Temkin and in the amount of $6,105.94 with respect to William and Helen Shapiro. The questions presented for our decision are whether Audubon Park Apartments, Inc., was a collapsible corporation under section 117(m) of the Internal Revenue Code of 1939 and, if it was, whether more than 70 percent of the gain realized by petitioners on the sale of their stock in that corporation is attributable to the construction of an apartment house.

### FINDINGS OF FACT.

Such facts as are stipulated are found.

Petitioners Maxwell and Mary Temkin, and William and Helen Shapiro, husbands and wives, respectively, filed joint individual income tax returns for the calendar year 1951 with the collector of internal revenue for the fifth district of New Jersey. Reference to petitioner or petitioners hereinafter means the husband or husbands. Use of their surnames also designates the husbands.

Prior to the fall of 1947 Shapiro had been employed for 23 years as head of the mortgage department and sole appraiser of a firm dealing in mortgages. In the fall of that year he suffered a heart attack which resulted in the impairment of the function of that organ. After his convalescence, upon the advice of his physician, he left his position with the mortgage firm and engaged in no business activity for the ensuing year. Temkin is and has been a realtor since 1926.

At a public auction of surplus city property held on January 10, 1949, Shapiro purchased certain vacant land from Jersey City, New Jersey, for a bid price of $5,000. The land is described as block 1283A, lot B–C, of that City and is located in a section advantageous to the construction and rental of apartment buildings. The minimum sale price was fixed by resolution of the board of commissioners of the City upon the following conditions, which Shapiro agreed to in writing:

The purchaser must construct on the purchased land a building containing not less than 12 dwelling units.

The property was not to be owned or used by a tax-exempt entity for a period of 10 years following delivery of the deed.

The purchaser was prohibited from alienating any interest he might possess in the property prior to delivery of the deed thereto.

Delivery of a deed to the premises was to be made only upon fulfillment of all conditions of the sale.

Default in the fulfillment of any condition would, at the option of the City, constitute a breach of the conditions of sale rendering the moneys paid by the purchaser forfeited and the City might resell the premises.

A day or two following the sale on January 10, 1949, petitioners entered into a partnership agreement for the purpose of constructing an apartment building upon the property purchased by Shapiro. Although they had not seen each other for 6 or 7 years prior to 1949, they had been acquainted for about 20 years. In pursuance of the purpose of the partnership agreement, Shapiro made application March 7, 1949, for mortgage insurance under section 608 of the National Housing Act. On June 3, 1949, the Federal Housing Administration approved the application and issued a commitment for insurance in an amount not to exceed $279,000. The amount of the commitment exceeded the total cost of construction of the apartment building. On July 15, 1949, Audubon Park Apartments, Inc., hereinafter designated Audubon, was organized as a New Jersey corporation. The common stock was issued two-thirds to Shapiro and his wife and one-third to Temkin and his wife. One hundred shares of preferred stock were issued to the Federal Housing Administration. On August 8, 1949, construction of a 36-rental-unit apartment building was commenced upon the property Shapiro had purchased. On the following day, Shapiro having completed payment of the purchase price therefor, the City delivered its deed of the land to Shapiro and, on the following day, he in turn sold the vacant land to Audubon at a purchase price of $5,000.

One of the most outstanding and reputable builders of Jersey City was engaged for the construction of the apartment building. When he had completed its construction, the building exceeded the construction requirements of the Federal Housing Administration. Petitioners experienced no difficulty in the renting of the apartment units. It was fully rented by the early fall of 1950.

During the progress of the construction Shapiro assumed most of the duties involved in obtaining and disbursing moneys required for the construction, in alloting the major building contracts, and generally administering the construction of the apartment building. Temkin, who "never did know" the construction business, spent most

of his time "on the job" acting as aid to Shapiro. He arranged sketches for the proposed rental of apartments, watched the arrival of building material, obtained prospectuses for tenants, and generally familiarized himself with the "construction game" and the duties of a managing agent. His duties as managing agent were in subordination to and as the assistant of Shapiro.

Ever since the heart attack which he experienced in the fall of 1947, Shapiro had been concerned with his health and had been taking medicines with respect to his heart condition for some time prior to the creation of Audubon. Generally he is a highly excitable, tense individual who is more than normally concerned with his health. He is inclined to be overly affected by physical ill-feeling on the one hand and medical evidence of good or unimpaired health on the other. In 1950 it was determined that he was also suffering from diabetes and he thereafter was treated for that ailment. During 1950 and 1951 electrocardiograms and other medical indications showed his heart to be in as good condition as it was upon recovery from his 1947 heart attack. As a result of such medical evidence, at the time of his purchase of the land here involved and the subsequent creation of Audubon, he was not more concerned with the imminence of a further heart attack than would be the case ordinarily where an individual had suffered and recovered from such an attack several years previously. However, on January 20, 1951, after construction of the apartment had been completed and while it was fully rented, Shapiro began to suffer pains in his chest and experienced unusual tiredness, weakness, and a feeling of exhaustion. On that date he visited his physician who examined him and determined there still was no additional damage to his heart, but advised him to "cut out what he was doing and to get away." Shapiro failed at that time to follow this advice. On April 16, 1951, he had a "typical attack of angina" and was examined by electrocardiogram on two occasions between that date and April 21, 1951. During that period he was required to remain in bed. In his physician's opinion, "he was doing too much for a man who had a heart condition," and he so advised Shapiro.

Prior to April 16, 1951, Shapiro and Temkin had received offers to purchase their stock in Audubon, but had refused to consider its sale. On April 17, 1951, however, Shapiro and Temkin and their respective wives entered into a contract to sell all of their Audubon stock and on April 30, 1951, consummated such sale. The Shapiros realized a gain of $27,297.79 on the sale of their stock and the Temkins realized a gain of $13,848.89 on the sale of their stock.

By June of 1950 all construction with respect to the apartment building had been completed. Certain repairs to walks, driveways, and steps, and considerable landscaping, including the establishment of a lawn, were still uncompleted by September of 1951.

Petitioners did not reasonably or otherwise anticipate that Shapiro would suffer another heart attack prior to their realization of a substantial portion of the rentals to be derived from the operation of the Audubon apartment. The reason for petitioners' sale of all their stock in Audubon was the illness of petitioner Shapiro and petitioner Temkin's financial inability to acquire Shapiro's stock coupled with his conviction that he was unqualified to manage the apartment.

OPINION.

Taken by its four corners, section 117(m) of the 1939 Code,[1] in the light of *Burge* v. *Commissioner*, 253 F. 2d 765 (C.A. 4), affirming 28 T.C. 246, *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2), affirming a Memorandum Opinion of this Court; *Weil* v. *Commissioner*, 252 F. 2d 805 (C.A. 2), affirming per curiam 28 T.C. 809; and *Sidney* v. *Commissioner*, 273 F. 2d 928 (C.A. 2), affirming 30 T.C. 1155; and its congressional history, means that if a taxpayer with the intent and purpose of disposing of all of the stock of a corporation prior to realization of a substantial portion of the income to be derived therefrom at any time "avails of" or uses a corporation for the purpose of constructing or creating property the operation of which would, but for the sale of all of its stock, produce ordinary income to the taxpayer and he actually disposes of all of its stock prior to the corporation's receiving a substantial proportion of the income from the operation of the created property, he has carried out a transaction which will result in realized gains being taxed as ordinary income. Generally, under section 117, such a transaction would produce gain taxable only as capital gain, but subsection (m) requires such gain to be taxed as ordinary income where the transaction is carried out for the purpose or with the "view" referred to. There is, however, no statutory presumption as distinguished from burden of proof that such an intent exists merely because a corporation was used to construct or create

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

    (m) COLLAPSIBLE CORPORATIONS.—

       (1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of a stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

       (2) DEFINITIONS.—

          (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

             (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

             (ii) the realization by such shareholders of gain attributable to such property.

such property or because of the sale of all of its stock. The existence of the proscribed "view," purpose, or intent must be determined as a question of fact from the evidence adduced.

There is no doubt that in the case before us Audubon was "availed of" or used by petitioners to construct an apartment house the operation of which would have produced and did produce ordinary income in the form of rents and there is no doubt that petitioners' stock in Audubon was sold prior to its realization of a substantial part of the rental income to be derived from the operation of the property constructed. In the light of *Burge* v. *Commissioner, supra*, and *Sidney* v. *Commissioner, supra*, it makes no difference whether it was so "availed of" before or after construction of the apartment project was completed. What prevents the application of section 117(m) is the absence of the proscribed "view," intent, or purpose. We think it is clear and virtually uncontradicted by direct evidence that from its creation petitioners had no intention to collapse Audubon or to sell their stock therein until Shapiro was so frightened by an attack of angina and the advice of his physician that he feared to retain any business interest which required of him more than a minimum output of energy. We are convinced that this is true because the sale of stock took place during Shapiro's attack even though both he and Temkin had consistently refused prior offers to purchase the stock. Even at that time, Temkin, who lacked sufficient funds to buy Shapiro's stock for cash, sought to acquire the stock from Shapiro on other than cash terms which Shapiro refused. Not having the required cash and feeling he was not qualified to manage the operation of the apartment without the supervision of Shapiro, he also disposed of his stock to the same purchaser at the same time. It is true that from the events shown, from their chronology, and their likeness to the facts in other reported cases, a conjectural conclusion could be drawn that petitioners had the proscribed "view" or intent at the formation of Audubon, but the evidence to the contrary is direct and much in preponderance. This sale of stock took place suddenly and as a result of a fortuitous event wholly apart from such a motive which controlled the action of the taxpayers.

Under Regulations 111, section 29.117–11, respondent claims that, because petitioner Shapiro had, prior to the completion of the construction in question, suffered a heart attack, the construction and distribution (sale of stock) occurred at a time when the same conditions were present which ultimately led to the sale of Audubon stock; that the final angina attack could have been "reasonably anticipated" and that therefore the corporation is to be considered collapsible under the statute. We think the construction of the apartment had been completed within the intendment of section 117(m) when it was fully occupied and producing income in the form of rentals long prior to

Shapiro's attack of angina and the sale of stock here in question. We have found as a fact that Shapiro did not reasonably or otherwise anticipate another heart attack during construction; that he is the type of individual who would be overly reassured by the continued medical evidence of good health which he received during and prior to the construction of the apartment. Certainly respondent does not wish to have his regulation so construed as to render it statutorily impossible for anyone who has suffered a heart attack to invest in the construction or production of income-producing property without assuming the certainty that should he suffer another attack which itself occasions the sale of his stock his gains are to be treated as ordinary income and so taxed. It is reasonable to anticipate that it is statistically possible or even probable that events will occur in the ordinary business of life which might require one who has invested in property of the type referred to in section 117(m) to sell the property, but so to construe the regulation that such possibilities preclude capital gains treatment of such sales would render the regulation in that respect invalid as not within the framework of section 117(m).

In the absence of the statutorily proscribed view, we hold the corporation not to be collapsible under section 117(m) and petitioners' gains from the sale of their stock to be taxable as capital gains. See *Charles J. Riley*, 35 T.C. 848.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: What is expressed in the present opinion would seem to me to require an opposite result. It attributes to section 117(m) the objective of taxing as ordinary income the proceeds of a sale "if a taxpayer with the *intent and purpose* of disposing of * * * the stock * * * prior to realization of a substantial portion of the income to be derived therefrom at any time 'avails of' * * * a corporation for * * * constructing * * * property * * * and he actually disposes of all of its stock * * *." (Emphasis added.) Clearly, these taxpayers did just that. The opinion asserts that "there is no doubt that petitioners' stock in Audubon was sold prior to its realization of a substantial part of the rental income to be derived" and that "it makes no difference whether it was so 'availed of' before or after construction * * * was completed." What is apparently supposed to make the section inapplicable is the absence of "the proscribed 'view,' *intent or purpose.*" (Emphasis added.) But there is only one "intent or purpose" referred to in the statute and the opinion evidently recognizes that such an "intent or purpose," namely to dispose of the stock before the realization of a substantial part of the income, existed here.

To fail to do so would require characterizing this sale as an involuntary act.

The only finding of fact remotely dealing with the subject of "intent or purpose" is expressed in terms of a motivation not in the slightest degree discernible in the structure of the statute. I cannot accept or concur in the Court's present reasoning.

MURDOCK, RAUM, PIERCE, and MULRONEY, *JJ.*, agree with this dissent.