COMPUTER SCIENCES CORPORATION, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3382-70.    Filed December 16, 1974.

---

*James S. Cline, James B. Isaacs,* and *John E. Gates,* for the petitioner.

*Sheldon M. Sisson,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended April 1, 1966, in the amount of $694,248. Some of the issues have been disposed of by agreement of the parties, leaving for decision whether Computax Corp., petitioner's wholly owned subsidiary engaged in the business of preparing State and Federal income tax returns, was a collapsible corporation within the meaning of section 341, I.R.C. 1954,[1] so that petitioner's gain on the sale of a controlling interest therein constitutes ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Computer Sciences Corp. (hereinafter sometimes referred to as CSC) is a Nevada corporation organized April 16, 1959. Its principal office at the time its petition in this case was filed was in El Segundo, Calif. Petitioner became a publicly owned company in 1963. Petitioner filed its Federal corporate income tax return for its fiscal year ended April 1, 1966, with the district director of internal revenue at Los Angeles, Calif.

Petitioner was organized by Fletcher Jones (Jones) and Roy Nutt (Nutt). Jones, from the time of petitioner's incorporation throughout the year involved in this case, was president and a director of petitioner. During 1965 and 1966 he owned approximately 40 percent of petitioner's outstanding stock. Jones was concerned primarily with the administration of petitioner and its sales. Nutt was concerned primarily with the technical aspects of petitioner's business. During 1965 and 1966 Nutt was vice president and a director of petitioner and owned approximately

---

[1] All references are to the Internal Revenue Code of 1954.

22 percent of petitioner's outstanding stock. Jones died in an airplane accident on November 7, 1972.

Jones and Nutt organized petitioner to engage in the design of computer programs for specific customers. A computer program is a list of instructions, one line at a time, each of which causes the computer to take a specific action. Once the program has been developed, it is preserved in the form of magnetic tapes, punch cards, or some other recording medium. In the industry, computer programs are referred to as "software," which term encompasses systems programs and application programs. In the industry "hardware" refers to the physical computer equipment. A systems program is a computer program designed solely to help someone else program or use a computer. An application program is a computer program which is designed to solve a particular problem; for example, to maintain personnel files or to handle a company's payroll. It is generally any computer program which is not a systems program.

Initially petitioner's business involved only the design and development of major systems programs for computer manufacturers and specialized programs for computer users, primarily the Government and aerospace industry. This work was done on a contract basis with petitioner receiving an agreed fee for performing a particular job for a particular customer.

By 1961, petitioner had grown to a point where it began offering services in the field of scientific applications on a contract basis for specific customers, but petitioner's major business remained systems programming.

In November 1962 petitioner was awarded a major contract to develop a basic systems program for UNIVAC's new model 1107 computer. As a part of this contract petitioner acquired under lease an 1107 computer, its first "on-the-premises" computer. The 1107 was a very advanced computer with an unusually large capacity to handle complex programs efficiently. To make the best use of the computer's capabilities, petitioner formed a separate service bureau division to sell excess time on the computer to other users and to expand its current customer servicing of specific problems by combining petitioner's programming expertise with its new computer hardware. After 1962 petitioner extended its activity to the development of proprietary projects. In the computer industry a proprietary project refers to a project developed at the creator's own

initiative and expense, the rights to which are retained by the creator. A proprietary project may be developed for use in a company's own business or for sale as a package program to another. A proprietary project which is to be supplied to another for a specific use, as for instance the keeping of an accounts payable ledger, is referred to as an application package. Application packages are sold or leased by the creator to customers such as banks which use the programs on their own computers.

In approximately February 1963, an employee of petitioner originated an idea for preparation of income tax returns by computer. He discussed his idea with Jones. Jones and Nutt further considered the idea and thereafter petitioner's management decided to proceed with work on the idea in order to find a method to increase the use of petitioner's 1107 computer. Petitioner's management was of the opinion that a program for preparation of tax returns, a yearly recurring need, would serve to bring more business into petitioner's service bureau as well as to utilize otherwise idle time of the 1107 computer. The development of the tax return preparation program was financed entirely with petitioner's own funds, and therefore, in terms of the computer industry, it was a proprietary project.

It was contemplated that this tax return preparation system would involve all aspects of return preparation including the preparation of forms for assembling information, the development of a computer program to handle the information and to physically produce the completed returns, the marketing of the system, the collection of fees for services actually rendered, and the attendant creation of the entire technical and marketing force required to operate the business. It was petitioner's intent to use the program developed to process income tax returns with its own service bureau and to keep secret the way this was done.

Neither Nutt nor Jones personally worked on the program for this service. Alan Stern (Stern) was hired to be in charge of its development. Stern did not own any stock in petitioner at that time, nor did he ever own 5 percent or more of the stock of petitioner.

Initially the return preparation service, which petitioner named Computax, was limited to a single customer, Skousen Tax Service (Skousen), located in Los Angeles, Calif., for which approximately 43,500 returns were prepared during the 1963 tax

season (i.e., January through April of 1964). This service was designed to operate solely in connection with interview forms to be used by this customer and was limited in scope in that it produced only the first and second pages of the individual income tax return. The initial service was to take data from the interview forms and have the computer do the arithmetic and print the results. The computer program used in this service for the 1963 tax season was written in the UNIVAC 1107 assembly language called SLEUTH.

The first year of Computax was a loss financially. Petitioner charged Skousen $1 per return and the cost to petitioner of preparing each return was approximately twice that, or $2 per return. Petitioner's management did not view this loss as significant. Upon evaluation of the results, petitioner's management concluded that the program was fundamentally viable and that petitioner should proceed to develop a more comprehensive program for use in the following year. Petitioner concluded that in the following year it would market the program to accountants or lawyers or other people who prepared tax returns for others with its own personnel. No consideration was given to developing the program in such a way as to make it salable to others as an application package to use on their own computers. Petitioner had a marketing survey conducted by Dun & Bradstreet. That survey indicated that there was a national market for the preparation of tax returns by computer. Petitioner's management concluded that the system developed for Skousen would not be applicable for use by accountants and attorneys but that it would be necessary for petitioner to develop its own input interview forms for use by accountants and attorneys. Petitioner proceeded to develop these forms and to write the new computer programs for use nationally in a language for use on its UNIVAC computer called COBOL. The new program was expanded to include additional schedules of the Federal return and also the New York and California State income tax returns. The service mark "Computax" which was used to designate petitioner's tax preparation service was filed with the Patent Office on November 9, 1964.

In the late spring of 1964, when petitioner's management decided to have petitioner market its Computax program directly to accountants and attorneys, petitioner had no marketing organization. Petitioner's marketing up to that time had

consisted of contacting computer manufacturers about programs for them, answering proposals from such manufacturers, and preparing proposals in response to requests for programs from the Federal Government. In the spring of 1964 some of petitioner's employees called on accountants with respect to the Computax program and petitioner hired several people to contact accountants directly. The effort to sell the tax preparation service in this manner was unsuccessful and in mid-1964 petitioner began trying to franchise the marketing of Computax to persons in various metropolitan areas. In 1964 petitioner entered into five long-term franchise agreements with various individuals, which agreements carried certain termination provisions. By the beginning of the 1964 tax season (i.e., January through April 1965) petitioner had a working and acceptable system for processing tax returns and estimated that approximately 500,000 returns would be processed on its 1107 UNIVAC during the 1964 tax season. Petitioner had hired personnel to handle this projected number of returns. During the 1964 tax season petitioner actually processed approximately 75,000 Federal and State income tax returns for about 1,100 customers principally in California and Metropolitan New York. The average billing rate for the service was $6 or $7 per return. Since petitioner processed less than one-fifth of the number of returns it had projected it would process, the results fell far short of its expectations financially. On the other hand, petitioner's officers considered the experience with processing the 1964 returns had established the concept in the minds of members of prestigious accounting firms around the country that the service was useful and that the approximately 1,100 firms that had used the service had generally been pleased with the product.

Following the 1964 tax season, meetings were held between Jones, Nutt, Daniel Mason (Mason), and David Layser (Layser). Layser was vice president of finance of petitioner and Mason was general manager of Computax. The principal problem discussed was the marketing of the service. It was the opinion of these officers of petitioner that the program itself had worked well and petitioner had the technical capability to perform the service satisfactorily, but the volume of business generated was grossly inadequate. Layser recommended that the Computax project be terminated, but Jones was optimistic about Computax as a business venture and geared the discussions largely to how it

could be marketed. Although certain employees of petitioner still were of the opinion that the franchising approach was a good one, Jones and Nutt agreed that this approach would not work for petitioner and that direct marketing and salesmanship were needed.

At the meeting shortly after the end of the 1964 tax season (i.e., about mid-April 1965) there was also some discussion about separately incorporating Computax and making a public offering of securities to raise additional funds. That meeting resulted in a decision that petitioner would offer the services of Computax for the 1965 tax season.

The computer program used in the Computax service was written for the UNIVAC 1107. The UNIVAC 1107 was one of the largest computers available at the time and there were very few of these computers in operation. The first production run of the 1107 computer by UNIVAC was only 16 machines. In 1962, 1963, and into late 1964, no UNIVAC 1107 computer was owned by any company or person other than UNIVAC, the Government, members of the aerospace industry, petitioner, and possibly one university.

At the time that Computax was being developed, there were only two UNIVAC 1107 computers in the United States that were available for outside users—the one in petitioner's service bureau and the other at the UNIVAC company.

The Computax program was designed to process a large volume of tax returns on this large computer and was attractive and economical only because the UNIVAC 1107 was able to process many returns in such a short turnaround time. Turnaround time refers to the period beginning with the receipt of the interview forms at the service bureau until the completed tax return is prepared and shipped. In 1965 and 1966 this took approximately 4 to 5 days, although it took the UNIVAC 1107 only about 5 seconds to do the actual calculations on each return. The balance of the turnaround time consisted mainly of preparing raw data for the computer and then turning out the finished product. As the raw data came in on interview sheets, it was keypunched by one employee onto a card which was then verified by another employee to insure the accuracy of the data going into the computer. The punch cards were then set up in batches, each card representing one return, and the information was run through a small computer which transferred the information onto magnetic

tapes. From 8 to 10 batches (approximately 500 returns) were then run through the UNIVAC 1107 at a time. The returns were produced 500 at a time and were printed one page at a time, i.e., 500 page 1's of Form 1040, 500 page 2's, etc. All returns were produced in triplicate. The carbons were then removed from the sheets and the pages of the returns were manually collated. Petitioner found that hand-assembling of the sheets of the returns was the most accurate, fastest, and best way to do the job. The return was then audited and shipped back to the preparer. The process required the services of a relatively large number of people.

The basic computer program used in the spring of 1965 in processing 1964 tax returns has continued in use throughout 1973. The logic of the program has remained unchanged from that used for the processing of the 1964 returns. The program remains directly tied to the use of the interview forms and to the large volume processing of tax returns which was envisioned from the beginning, and to the UNIVAC 1107 computer or its successor, the UNIVAC 1108. During recent tax seasons Computax processed nearly a million returns using the same logic as was used in the original program. However, Computax now processes many more schedules and types of returns, such as depreciation schedules, calculation of a capital loss carry-forward, income averaging, and partnership, corporate, and fiduciary returns. Each year additional State returns have been added and for the 1973 tax returns Computax was capable of processing returns of 35 States. The additional schedules and State tax returns were gradually added through the years from the 1965 returns processed in early 1966 until the time of the trial.

It was not until an annual volume of several hundred thousand returns was reached that Computax became profitable.

In the spring of 1965, when Jones, Layser, and Nutt had discussions concerning the possible separate incorporation of Computax, they concluded that separate incorporation might be desirable to solve certain corporate and personnel problems. Since Computax was aimed at a nationwide market, the question was raised whether petitioner might otherwise have to qualify to do business in States in which its only business was Computax. The types of personnel used in the Computax work were different in training from the other employees of petitioner. Petitioner's staff had a number of high level professionals, including 20 to 25

Ph.D.'s, to whom petitioner was required to pay high salaries and to offer attractive fringe benefits. Computax, on the other hand, was a seasonal business with operations performed primarily by large numbers of keypunch operators and less skilled personnel hired for the early months of each year. Petitioner's officers did not consider it feasible to give the same fringe benefits to a keypunch operator hired on a temporary basis as it did to its professional staff of programmers. Also petitioner had a number of Government contracts and its accounting was subject to Government review and audit, whereas Computax was purely commercial and petitioner's financial officer considered it better not to commingle the two accounting systems.

On June 9, 1965, Computax Corp. (Computax) was formed under the laws of Nevada. On June 23, 1965, Computax issued 800,000 shares of its corporate stock to petitioner in exchange for petitioner's interest in Computax and became a wholly owned subsidiary of petitioner.[2]

Among the assets transferred by petitioner to Computax were computer programs for the Computax service used in 1965 for the 1964 tax season; magnetic tapes containing such computer programs; interview forms and copyrights relating thereto; rights to all Computax instructions and promotional materials; various physical assets such as desks and chairs; know-how with respect to scheduling and production; and customers' lists and goodwill.

Concurrently with the transfer of assets to Computax those executive and technical employees whose services during the past years had been directed principally to the Computax service were transferred to the payrolls of Computax and ceased being employees of petitioner.

Unknown to petitioner, Commerce Clearing House, Inc., of New Jersey (hereinafter CCH) claimed to hold a trademark on the name "Computax" as a designation for a slide rule type calculator for use in computing taxes. In October 1964 CCH first became aware of petitioner's use of the name Computax as a result of petitioner's advertising its services with respect to preparation of tax returns in the Journal of Accountancy. On November 6, 1964, Charles E. Rackliff, president of CCH (New Jersey) wrote to petitioner requesting petitioner to stop using

---

[2] The stipulation is that 800,000 shares were issued to petitioner, but there is other evidence indicating that 1 million shaⅰⅽs were issued to petitioner. It is not necessary to our decision that we resolve this conflict.

"Computax" as a service mark for its tax service. Jones responded by a letter dated November 27, 1964. In this letter, Jones expressed his opinion that, since petitioner's service Computax was offered through different channels of trade and to different customers, and performed an entirely unrelated function to that of CCH's Computax booklet and calculator, no confusion would result from the use by both CSC and CCH of the name "Computax."

On April 19, 1965, Jones met with Robert C. Bartlett of CCH at the latter's office in Chicago, Ill.

In the middle of May of 1965, Jones asked Mason to prepare a presentation to acquaint the executives of CCH with a more precise idea of what Computax was, what had been done up to the present time, and what its plans for the future were. This was the first time Mason had heard of CCH in connection with petitioner. The purpose of the presentation was to secure a marketing agreement with CCH so that its national sales force would also sell the Computax service throughout the United States. CCH's marketing capability was attractive because its salesmen regularly visit the accountants and attorneys who are the potential customers of Computax. For CCH to market Computax would simply mean its salesmen would offer this new service to the same persons on whom they regularly called. Mason spent a week or 10 days putting together the presentation which he gave on May 27, 1965, at a meeting in Chicago between representatives of petitioner and CCH. At that meeting, Mason moderated the presentation covering the technical data and marketing aspects of the service and Jones concluded the presentation. There was no discussion in Mason's presence at that meeting relating to a sale of Computax to CCH.

In late May of 1965 Jones told Nutt that he thought he had a solution to petitioner's problems with Computax, since in his discussions with the president of CCH he had understood that instead of merely becoming a marketing agent for Computax CCH was interested in acquiring an equity in Computax. Nutt was pleased with this news since he believed the arrangement would provide petitioner with additional capital for future development of the Computax project as well as solve the marketing problem.

Layser was not present at the May 27, 1965, meeting with representatives of CCH since it was not expected to involve

financial affairs of petitioner. Layser was present at a later meeting between representatives of petitioner and of CCH in El Segundo, Calif., in June 1965. There was a general discussion of various ways in which CCH might enter into a marketing relationship with petitioner for Computax. These negotiations did not progress very far because relatively early in the discussions representatives of CCH made it known that it was not interested in participating in Computax other than by having a controlling equity position.

A subsequent meeting was held in New York in early July 1965 between Layser, Mason, and Jones for petitioner and members of the board of directors of CCH. At this meeting Mason first learned of CCH's interest in purchasing an equity position in Computax.

On September 24, 1965, petitioner and CCH entered into an agreement pursuant to which on September 27, 1965, CCH purchased from Computax 200,001 shares of the authorized and unissued capital stock of Computax for a cash consideration of $1,400,000 and agreed to purchase from petitioner an additional 400,000 outstanding shares of Computax's capital stock for a cash consideration of $2,900,000. The purchase from petitioner was completed on January 28, 1966. After this purchase, CCH held 50 percent plus 1 share of the stock of Computax.[3]

In the time between negotiations with CCH in July and the execution of the agreement on September 24, 1965, Mason was working independently in attempting to develop a marketing program for Computax to be executed by Computax employees. Mason's goal was to market Computax on a national basis so as to produce the volume of returns needed to operate the service efficiently.

For financial reporting purposes, petitioner, commencing April 1, 1964, capitalized the excess of direct costs over billings for the Computax service with the intent of amortizing the deferred amount over 2,500,000 tax returns processed commencing with the 1966 tax season or over the three fiscal periods through 1968, whichever occurred first. The total direct costs associated with the Computax business which petitioner capitalized were approximately $1,106,000 which included all the expenditures

---

[3] The record shows that CCH held 600,001 shares of Computax and petitioner held 600,000 shares, making a total of 1,200,001 shares. See fn. 2 *supra*, to the effect that at least prior to Sept. 27, 1965, petitioner must have held 1 million Computax shares.

for the period April 1, 1964, to July 15, 1965, related to the development, research, marketing, education of employees, and actual operations of the computer center in preparing the tax returns during the 1964 tax season. Revenues for the operation during the 1964 tax season were approximately $540,000, so the difference of $566,000 between the total costs and the revenues from operations represents the unrecovered direct costs attributable to the research and development of the Computax service for that period from April 1, 1964, through July 15, 1965.

The net worth of Computax at the time of the sale of its stock by petitioner was $8,600,000 as determined under section 341(e)(7).

Petitioner, during the 3-year period preceding the sale of stock in Computax, owned more than 20 percent in value of the outstanding stock of three other corporations. These three corporations, all wholly owned subsidiaries, were System Sciences Corp., Communication Systems, Inc., and Alfred Politz Research, Inc. Petitioner made no sale of stock in any of these corporations within the 3-year period preceding January 28, 1966. None of the three corporations made a sale or exchange of property, gain or loss on which was not recognized under section 337(a), during the 3-year period preceding January 28, 1966, while petitioner owned more than 20 percent in value of the outstanding stock of such corporations.

Prior to January 28, 1966 (the date of sale of an interest in Computax to CCH), petitioner had never sold a proprietary applications program or system of that type or any shares of its stock other than as an issuer. Any work petitioner had done during or prior to the year 1965 on the development of any proprietary program to be sold as an application package had not resulted in any sales. Later petitioner did develop proprietary projects for sale as application packages. The first such sale made by petitioner was in 1967 or 1968 of a payroll package. Thereafter, petitioner developed and sold other application packages. The financial statements in petitioner's 1966 annual report showed the sale of stock of Computax to CCH as an extraordinary item stated separately from revenues. This was handled in this manner because petitioner's management considered the sale to be a nonrecurring item distinguishable from sales made in the ordinary course of petitioner's business.

Following the sale, petitioner and CCH decided that the management of Computax might be simplified by forming a new company to be basically a holding company of Computax stock, so they incorporated Computax Services, Inc. Petitioner and CCH each transferred their shares of Computax to Computax Services, Inc., in exchange for stock of that company.

In fiscal year 1968 petitioner sold about 10 or 11 percent of its stock in Computax Services, Inc., subject to a repurchase agreement enforceable by the buyer, to a mutual fund and showed the gain realized as an extraordinary item in its 1968 annual report.

In 1969, petitioner began reporting as revenue income in its financial statements all gain from the sale of proprietary products. In its 1969 annual report petitioner, for the purpose of comparing current year's earnings with prior years, changed its method of showing the gains from the sale of Computax stock to CCH and of stock of Computax Services, Inc., to the mutual fund from extraordinary items to items of revenue from sales occurring in the ordinary course of business, and explained this treatment as follows:

For the year ended March 28, 1969, the Company began reporting separately as revenues all income derived from the marketing of proprietary products, services and rights thereto. This marketing may take the form of sales of services using a program or system, sales of individual programs and applications, sales of stock in a subsidiary providing the service, or sale of rights to a system. Federal income taxes on these revenues are provided at either capital gains or ordinary income tax rates depending on the tax applicable to the transaction. The Consolidated Statement of Net Earnings for the year ended March 29, 1968 has been restated to conform to this presentation by reclassifying the gain on sale of investments in COMPUTAX Services, Inc. of $842,000, net of income tax of $281,000, previously reported as an extraordinary item. * * *

Petitioner's 1964 annual report contained the following statements:

CSC has initiated the marketing of several new programming products and services which will be made available during the coming year to major segments of the business and industrial fields.

To the large population of tax accountants, CSC will offer a new service of computer-prepared federal and state tax returns. After several years of extensive research, the development of complex computer programs, and the successful completion of a test program this year in which 43,000 returns were processed on the 1107 computer, CSC is prepared to market this service in major cities throughout the country.

A letter from Jones to petitioner's shareholders, contained in the 1965 annual report, stated in part the following:

The company's proprietary developments, which have occasioned significant profit investment in the past eighteen months, have been established as sources of dramatic increases in revenues and profit for the immediate future and beyond. The remote data-link system was completed and applied to operations during fiscal year 1965; this investment, resulting in the first operational remote on-line system of computer use in the world, will have returned all development costs by mid-1965, and should be significantly profitable thereafter.

The company's largest single proprietary investment has been in COMPUTAX, the system for computer preparation of tax returns. During fiscal year 1965, the COMPUTAX system was expanded and put into limited production in the New York and Southern California metropolitan areas. The response from accountants throughout the country has been outstanding in its enthusiasm and acceptance. Subsequent inquiries of the more than 1100 accounting firms using the system this past tax season indicate that more than 98 percent plan to use the COMPUTAX system during 1966, all to an increasing extent. As of this writing, CSC is defining a plan which will put COMPUTAX into use in seventeen states or more during fiscal year 1966. While relatively large expenditures have been made on COMPUTAX development, these will be more than justified by the resulting and ongoing profit contribution.

A similar letter from Jones in petitioner's 1966 annual report stated in pertinent part as follows:

Fiscal 1966 was a year of significant accomplishment for Computer Sciences Corporation. The Company achieved both sharply improved financial results and demonstrable progress in its development as the leading independent organization in the field of information sciences.

* * * Sales of proprietary products, represented nearly entirely by the sale of an interest in the Computax system, contributed $2,714,000 to the fiscal 1966 revenues reported above and $1,989,000 to net income.

* * *

During fiscal 1966 the Company formed Computax Corporation, a result of the effort and proprietary financial investment of previous years in the Computax project. Subsequently, a majority interest of 50% plus one share of Computax Corporation stock was sold to Commerce Clearing House, Inc. in order to bring together the pronounced marketing skill of CCH with the technical resources of CSC. The 1966 tax season just ended has confirmed the cogency of the CCH-CSC relationship through a difficult initial period of marketing and operational start-up for Computax Corporation. The CCH-CSC combination of capabilities is confidently expected to achieve substantial success in the ongoing years, and to thereby produce positive results from the Company's continuing investment in Computax Corporation.

In the meantime, the excellent results from previous investments in Computax and other projects illustrate the soundness of the company policy to

undertake proprietary funding of new developments for subsequent resale. The Company is continuing a program to define and develop proprietary products, and management expects that these efforts will contribute substantially to CSC's profitability in the coming years.

Note 4 of the annual report of petitioner for its fiscal year ended April 1, 1966, stated in part as follows:

NOTE 4—COMPUTAX Corporation: The Company develops proprietary programs for sale to customers. During the year ended April 2, 1965, the Company made certain expenditures to develop a program for preparation of individual income tax returns by using computers (COMPUTAX). At April 2, 1965, the Company had deferred the costs of development of the technical and marketing programs and the excess of costs of processing returns over revenues received for the first tax season. The costs were deducted in the Company's federal income tax return for the year ended April 2, 1965, and were reported net of deferred federal taxes provided for the difference between reporting for tax purposes and reporting for financial statement purposes.

During June 1965, the Company sold the rights in the computer system, customer lists and technical and marketing programs to COMPUTAX Corporation in exchange for 1,000,000 shares of COMPUTAX Corporation stock. The value assigned to the investment in COMPUTAX Corporation was the amount of the net deferred development costs at the date of sale.

During September 1965, COMPUTAX sold 200,001 shares of its previously unissued stock to Commerce Clearing House, Inc. for cash and in January 1966, the Company sold 400,000 of its shares of COMPUTAX Corporation to Commerce Clearing House, Inc. for $2,900,000.
     * * *
Under terms of the sale to COMPUTAX Corporation, the Company has provided and will continue, for at least the next four years, to provide COMPUTAX Corporation computing and outside programming services for updating and refinement of the COMPUTAX program for which the Company will be reimbursed at its standard billing rates.

The annual income or loss of Computax for each of its fiscal years ended September 30 was as follows:

|  | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|
| Income from services | $1,887,599 | $2,779,840 | $4,107,377 | $6,880,679 | $11,017,084 |
| Expenses: |  |  |  |  |  |
| Costs of services | 3,417,140 | 2,261,657 | 2,744,012 | 4,384,892 | 6,895,863 |
| Selling, general and administrative | 799,576 | 729,718 | 1,023,996 | 1,676,559 | 2,716,598 |
| Amortization of development cost | 155,056 | 155,057 | 155,057 | --- | --- |
| Depreciation, straight-line method | 49,088 | 57,476 | 66,557 | 89,972 | 110,344 |
| Interest | 25,934 | 42,554 | 39,870 | 43,113 | 46,278 |
|  | 4,446,794 | 3,246,462 | 4,029,492 | 6,194,536 | 9,769,083 |
| Income or (loss) (before taxes) | (2,559,195) | (466,622) | 77,885 | 686,143 | 1,248,001 |

Petitioner created another subsidiary called Computicket in 1967 or 1968, in which the two individuals who originated the idea owned a minority interest. Computicket was designed to sell tickets to athletic, sporting, and entertainment events that

required a prior reservation. The reservation could be made at terminals located at convenient places such as department stores. Each terminal would be hooked into the UNIVAC computer which could monitor the availability of seats.

Petitioner on its Federal income tax return for its fiscal year ended April 1, 1966, reported the entire $2,900,000 received from CCH for the 400,000 shares of Computax stock as long-term capital gain. Respondent determined that the gain from petitioner's sale of Computax stock to CCH should be treated as ordinary income because Computax Corp. was a collapsible corporation under the provisions of section 341.

## OPINION

Section 341 provides that the gain from the sale or exchange of stock of a collapsible corporation to the extent that it would be otherwise considered as gain from the sale or exchange of a capital asset held for more than 6 months shall be considered as gain from the sale or exchange of property which is not a capital asset. This section, insofar as here applicable, defines collapsible corporation as a corporation formed or availed of principally for the production of property with a view to the sale or exchange of the corporate stock by its shareholders before the realization by the corporation producing the property of a substantial part of the taxable income to be derived from such property.[4]

---

[4] SEC. 341. COLLAPSIBLE CORPORATIONS.

(a) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from—

(1) the sale or exchange of stock of a collapsible corporation,

(2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and

(3) a distribution made by a collapsible corporation which, under section 301(c)(3)(A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property,

to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.

(b) DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

Petitioner in the instant case takes the position that Computax was not a collapsible corporation within the provisions of section 341 since it was not formed or availed of principally for the production of property since its program for preparation of tax returns on the UNIVAC 1107 computer is not property as the term is used in section 341. In taking this position petitioner recognizes that under the provisions of section 341(b)(2)(B) and section 1.341-2(a)(5)(ii), Income Tax Regs., if the program which it developed for the preparation of income tax returns on the UNIVAC 1107 computer is property within the meaning of section 341 in petitioner's hands, then it is such property in the hands of Computax since it would be "property having a basis" in the hands of Computax determined "by reference to the cost of such property in the hands of a person who * * * produced, * * * the property." Petitioner's position is that what it developed and transferred to Computax in return for Computax stock was not property as that term is used in section 341, but rather was "know-how" and goodwill which would not fall within the ambit of property as used in section 341.

As a second position, petitioner contends that if the program for processing income tax returns on the 1107 computer is considered property within the meaning of section 341, then the development of that property had been completed prior to the time that petitioner formed a view to sell any part of the stock in Computax. From this petitioner concludes that under the provision of section 1.341-2(a)(3)[5] of the regulations, it should

---

(B) the realization by such shareholders of gain attributable to such property.

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

    (A) it engaged in the manufacture, construction, or production of such property to any extent,

    (B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

    (C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation.

[5] Sec. 1.341-2(a)(3), Income Tax Regs.:

(3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the

not be considered to have been formed or availed of with a view to the sale of stock in Computax before the realization by Computax of a substantial part of the taxable income to be derived from the property. If petitioner is correct in either of these positions, it would follow that Computax is not a collapsible corporation within the meaning of section 341.

Respondent takes the position that the computer program for the preparation of income tax returns on the UNIVAC 1107 computer is property which petitioner produced to be sold as an application package to its customers or which it planned at the time it was producing the property to transfer to a subsidiary the stock of which it planned to sell.

Respondent argues that the production of the program for the processing of tax returns on the 1107 computer had not been completed prior to the time that the officers of petitioner contemplated the transfer of this property to a corporation and the sale of stock in that corporation. From this, respondent concludes that Computax is a corporation formed or availed of by petitioner with a view to the sale of its stock prior to the realization of a substantial part of the taxable income to be derived from the property it produced and therefore is a collapsible corporation within the provision of section 1.341-2(a)(3), Income Tax Regs.

The record here shows that petitioner through its employees developed a program for the preparation of tax returns on the UNIVAC 1107 computer and that work was begun on developing this program in the early part of 1963. The record further shows that petitioner's officers viewed this program which petitioner was developing as a proprietary program as distinguished from a program developed under contract for some other person which had been its only business up until approximately the end of 1962 when it acquired an 1107 UNIVAC computer. The record here shows that petitioner worked on development of proprietary projects for two purposes. Some of the proprietary projects developed by petitioner were developed for its own use so that it could obtain additional customers for its service business and others were developed for sale as application packages to

corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

customers for use on their computers. Initially petitioner's development of the proprietary projects was for programs that it could use to enable it to use its UNIVAC 1107 computer on a full-time basis. Later petitioner began to develop proprietary projects which it sold as application packages to various companies, such as banks, for use by them on their own computers.

Although respondent argues to the contrary, on the facts here presented we conclude from the evidence in this case that the program developed by petitioner for the processing of income tax returns on the UNIVAC 1107 computer was a proprietary project developed for use by petitioner in its own trade or business of rendering the service to its customers of processing income tax returns on the UNIVAC 1107 computer.

The testimony of every witness who testified in this respect specifically states that the program for the preparation of income tax returns on the 1107 computer was developed by petitioner for use in its own business so as to have additional work for the 1107 computer which it had acquired. These witnesses were credible. Furthermore, the testimony of these witnesses is corroborated by the other evidence of record. At the time petitioner began development of the program for the preparation of income tax returns by the 1107 UNIVAC and for some years thereafter, the only 1107 computers available outside of those used by the Federal Government and aerospace industry were at UNIVAC itself and at petitioner's place of business. Therefore, there would be no market for the sale as an application package of a computer program which required the use of an 1107 computer since no prospective customer would have available an 1107 computer at its business. In our view the record is clear that petitioner developed the program for processing income tax returns on the 1107 computer for use in its own business. In reaching this factual conclusion we have considered the evidence pertaining to the programs which petitioner developed as application packages and sold to various companies which used the programs on their own computers. We have not overlooked the fact that there is language in certain of petitioner's annual reports and other documents prepared by petitioner's officers which refer to the proprietary projects developed for use by petitioner in its own business and the proprietary projects which resulted in application packages in the same context. When the nature of petitioner's business is considered, in our view these statements

cease to be confusing and in no way detract from the conclusion we have reached that the program for the processing of income tax returns on the UNIVAC 1107 computer was a program developed by petitioner for its own business.

The fact that the program for use of the 1107 computer for processing of income tax returns was not stock in trade of petitioner or property held by petitioner for sale to customers in the ordinary course of its trade or business does not, however, mean that this program was not property produced by petitioner within the meaning of section 341. Petitioner argues that property manufactured, constructed, or produced by a taxpayer as used in section 341 was not intended to apply to intangible property of any type, and, if the section were intended to refer to intangible property, that no such intangible property was produced by petitioner since all that petitioner produced and developed for transfer to Computax was "know-how" and goodwill which is not "property."

Petitioner states that no case involving section 341 has dealt with intangible property and that it is clear from the legislative history of the section that the intent of the section was to deal with tangible property such as apartment houses or motion pictures. Petitioner argues that the "know-how" and goodwill would not be property which it produced but rather merely the result of its operating a service business. Petitioner in effect concedes that the program and interview forms which it developed had a value but apparently contends that development of such a property is not production of that property. In our view the evidence here shows that the computer program and copyrighted interview forms developed by petitioner are intangible property developed by petitioner.

Although neither party has called our attention to any case, nor have we found one, dealing with whether development of an intangible asset such as that involved herein should be considered to be production of property within the meaning of section 341, from a consideration of the statute as a whole we conclude that it should be so considered. Generally, intangible assets are considered to be property. Where a section of the Revenue Code is intended to refer to only tangible property, it so states. The word "production" in its ordinarily accepted sense, as well as under its dictionary definition, would include the development of an intangible asset. The primary definition of "production" in

Webster's Third New International Dictionary (1961) is "something that is produced naturally or as the result of labor and effort." Certainly, this definition would include the development by a taxpayer of an intangible asset.

Section 341(e)(5)(A)(iv) includes in the term, "Subsection (e) asset," property which consists of "a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property," which was created by the personal efforts of any individual who owned more than 5 percent in value of the stock of the corporation. Clearly, some of the items referred to in that section are intangible assets in the nature of the copyrighted forms developed by petitioner and the computer program developed by it for the computer preparation of income tax returns. If section 341 were not intended to include in property produced, intangible assets, it would appear that some such statement would be made where such assets are included as "section 341(e)" assets. We conclude that petitioner did produce property within the meaning of section 341 which was transferred to Computax.

The facts here are also clear that Computax was formed and availed of within the meaning of section 341 for the production of this intangible property since the property took the basis in its hands which it had in petitioner's hands. It is therefore necessary for us to determine whether at any time prior to the completion of the production of the computer program which is the property produced by petitioner and transferred to Computax, the stockholder of Computax had a view to the sale or exchange of the Computax stock before the realization by Computax of a substantial part of the taxable income to be derived from the use of this computer program.

Section 1.341-2(a)(2), Income Tax Regs., provides that the requirement that a corporation be formed or availed of with a view to the sale or exchange of its stock by its shareholders prior to the realization by the corporation producing the property of a substantial part of the taxable income to be derived from such property is "satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, * * * whether such action was contemplated, unconditionally, conditionally, or as a recognized possibility." In our view the evidence here shows that the view to sell stock in

Computax existed at the time Computax was formed toward the end of June 1965.

Petitioner argues that the view was not formed until at least some time in July since it was in July that serious negotiations with respect to the sale of stock by petitioner to CCH took place. However, petitioner's vice president testified that in late May 1965 he discussed with petitioner's president the possibility of CCH's buying an interest in the computer program for processing income tax returns on the UNIVAC 1107 computer. Petitioner would discount this testimony because of other testimony in the record that at the May meeting between petitioner's president and representatives of CCH they heard no discussion about CCH's purchasing an interest in the computer program. In our view it does not follow, from the fact that certain officers of petitioner heard no discussion about the purchase by CCH of an interest in Computax at the meeting of the representatives of petitioner and CCH in May 1965, that petitioner's president and vice president had not earlier discussed this possibility. The May meeting was for the purpose of representatives of CCH seeing the nature of the program and determining their ability to market the program, which would be a necessary preliminary for CCH to determine to what extent it might be interested in purchasing an interest in the company that owned that program. The demonstration might well have been made to supplement a discussion which had taken place between petitioner's president and representatives of CCH with respect to CCH's purchasing an interest in the program. The testimony of petitioner's vice president is that he became aware of CCH's interest in partial ownership of Computax in late May 1965 and this testimony is supported by the other evidence in the record. We therefore conclude that in late May 1965 the persons in a position to determine petitioner's policies conditionally formed the view, or at least had considered it a recognized possibility, that a corporation would be formed to which the computer program would be transferred and that stock in this corporation would be sold to CCH. There are inferences in the record that this view may have been conditionally formed as early as April 19, 1965, but this date is the earliest date that the record contains any indication that petitioner's officers in any way considered selling any interest in Computax.

We find it necessary therefore to determine whether by mid-April 1965 the production of the computer program which petitioner transferred to Computax had been completed. Section 1.341-2(a)(3), Income Tax Regs., states in part that "if the sale * * * [of the stock] is attributable solely to circumstances which arose after the * * * production * * * (other than circumstances which reasonably could be anticipated at the time of such * * * production, * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been" formed or availed of for the sale of its stock by its shareholders prior to the realization of a substantial part of the income to be derived from the property produced. The facts here are clear that petitioner did sell stock in Computax to CCH prior to the time that a substantial part of the income to be derived from the computer program (property) it had produced was realized. This fact, however, does not cause Computax to be a collapsible corporation unless the view to make the sale was formed prior to completion of production of the computer program. *Charles J. Riley*, 35 T.C. 848, 858-859 (1961).

Petitioner argues that if its development of the computer program is considered the production of property, then the production of this property was completed by the end of 1964. Respondent, on the other hand, argues that since there were continuing increases in the coverage of the State returns which could be prepared on the computer and a continuing increase in the schedules of Federal income tax returns which could be prepared on the computer, the production of the program had not been completed at the time of the formation of Computax in June 1965, or, as for that matter, either in September 1965 when the agreement was made to sell stock to CCH or in January 1966 when the actual sale was made.

The evidence shows that additional schedules of the Federal returns and additional State returns have been added to the program yearly to the time of the trial of this case. However, in our view, this does not require a conclusion that the computer program, which is the property with which we are concerned here, had not been completely developed or produced prior to mid-April of 1965. It is customary for changes and improvements to be made continuously on any process, whether or not the process is patented or is a patentable process. It would therefore follow that no process or patent developed by a taxpayer would be

considered to have passed the stage of production at any time if we considered these improvements as part of the production of the property. We must therefore determine when the property, the program for the preparation of income tax returns by Computax, had been completely developed. If the development of the program itself had been completed prior to mid-April 1965, the fact that this developed program was improved and extended would not mean that the view to sell stock in Computax was made prior to the completion of the development of the Computax program.

The determination of the factual question of when the program was completed must be made from the record as a whole. The question has arisen on a number of occasions in connection with the construction of buildings as to when the construction was completed. We have considered the construction to be completed when the building was ready to be occupied and produce income (*Maxwell Temkin,* 35 T.C. 906, 911-912(1961)), but that a real estate project should not be considered as constructed until it is in shape to realize income (*Edward Weil,* 28 T.C. 809, 815 (1957), affd. 252 F. 2d 805 (C.A. 2, 1958)). In the *Weil* case we pointed out that "Partial completion, near completion, or even substantial completion are thus not effective substitutes for full completion of the 'construction.'" The property involved in the *Weil* case was a shopping center, the buildings of which were complete but the shopping center was not usable because the parking area which was necessary for the tenants to occupy the buildings had not been completed.

Another case involving whether construction of property had been completed is *Sproul Realty Co.,* 38 T.C. 844 (1962). In that case the taxpayer purchased property for construction of a shopping center and did the preliminary site planning, zoning, leasing, and obtaining of mortgage commitment. Before physical construction of the center began the taxpayer agreed to sell the entire center under a contract that provided it would do the construction work on the project for the purchaser. We concluded that construction as used in the statute had taken place by the taxpayer in the preliminary work the taxpayer had done. The taxpayer argued that if this were the fact, its "construction" was complete prior to the time it formed its view to sell the property. We concluded that, since from inception the construction contemplated by the taxpayer was that of the physical con-

struction of the shopping center, construction within the meaning of the statute had not been completed at the time of the sale, and we distinguished such cases as *Maxwell Temkin, supra,* and *Jacobson v. Commissioner,* 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893 (1959).

While these cases involving construction of real estate give us guidelines as to what constitutes completion of construction, they are so factually different from the instant case as to be of very little help. If we use the criterion that production is completed when the "property" is in shape to realize income, then we would have to conclude, as petitioner does, that the completion of production of its computer program had occurred by the end of 1964, for by that time the system had produced gross receipts of over $43,000 even though the total operation of processing the 1963 tax returns in the year 1964 was at a small loss. Petitioner was ready to process 500,000 returns during the 1964 tax season in the early months of 1965. Had petitioner obtained the customers for 500,000 returns, it would undoubtedly have had net income for the 1964 tax preparation season. Therefore, if we compare petitioner's situation at the end of 1964 to construction of rental property, it would follow that the "construction" was completed but tenants had been found for only a few of the spaces available for rent.

The record as a whole is clear that petitioner was working out problems with the program during the year 1964, which problems were to a large extent ironed out during that year. By the time it began processing 1964 returns in the early part of 1965, it was in a position to make runs of 500 returns at a time on its computer. The gross income produced from the processing of 1964 returns in early 1965 was in the neighborhood of one-half million dollars, but because of the cost of processing such a small quantity of returns as petitioner obtained for processing, the net result was a loss of nearly $1 million. We do not consider the criterion of available for producing income used in the construction cases to be completely applicable here. Ordinarily, construction is complete before a tenant moves in and begins paying rent, even though, of course, the operation of the rental of the building may be at a loss. However, it is not uncommon for the developer of a process to charge for services or the product produced from test runs of the process which are made during the course of development.

In our view one approach to determining whether production of the program was completed is to compare the process here to the development or production of a patent. The question has arisen before this Court in connection with the definition of "holder" of all substantial rights to a patent under the provisions of section 1235(b) as to when a patent has been reduced to practice. That section includes in the definition of "holder" certain individuals who acquire an interest in the patent for consideration in money or money's worth "prior to actual reduction to practice of the invention covered by the patent." In discussing this section in *Elmo Meiners* , 42 T.C. 653 (1964), we stated at pages 657-658:

As originally enacted by the House, section 1235 was limited in its benefit to the "first and original" inventor of a patentable device within the meaning of title 35 U.S.C. section 31. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. a280 (1954). The Senate, however, being "desirous of extending the scope of this section to cover (in addition to inventors) those individuals who contribute financially toward the development of the invention," S. Rept. No. 1622, 83d Cong., 2d Sess., p. 440 (1954), added to the House version of section 1235 what is now section 1235(b)(2). * * *

See also *Clement O. Dennis,* 57 T.C. 352, 365 (1971), affd. 473 F. 2d 274 (C.A. 5, 1973).

Section 1.1235-2(e), Income Tax Regs., defines "actual reduction to practice" as having the same meaning as it does under section 102(g) of title 35 of the United States Code, which section is a part of the Code dealing with patents and further states:

Generally, an invention is reduced to actual practice when it has been tested and operated successfully under operating conditions. This may occur either before or after application for a patent but cannot occur later than the earliest time that commercial exploitation of the invention occurs.

This definition of "reduction to practice" appears to also define the time of completion of production of the patent and in our view is an acceptable definition of when production of a process or program which is not patented is completed.

In discussing the time when reduction to practice of a patent had occurred in *Goodrich v. Harmsen,* 442 F. 2d 377-383 (Patents 1971), it was pointed out that it was not necessary that testing had proceeded to the point where the invention was actually ready to be put into commercial production without

further testing for reduction to practice to have occurred, but rather—

that the tests should suffice to persuade practical men to take the *risk* of commercializing the invention—"that the product will serve the purpose for which it is designed" and therefore *can* be commercialized. In the nature of things, testing goes on throughout the process of "commercializing" and often continues after a product is on the market where it usually receives its severest test.

Although the issue in all cases requiring a determination of when the conclusion of production of a process or program which is an intangible asset has occurred cannot be determined by the rules regarding when "reduction to practice" of a patent has occurred, the guidelines used for the two are more comparable than the guidelines we have used in determining when construction of real property is complete are to those of determining when production of a process is complete. In our view a process that will go through continuing change and development throughout its use should be considered for the purpose of section 341 to have had its production stage ended at such time as it is ready for true commercial use and the production of income on a commercial basis. Using this criteria, under all the facts present ·in the instant case, we conclude production of the program for the processing of income tax returns on the UNIVAC 1107 computer had been completed at least by mid-April 1965 when the 1964 income tax return preparation period had ended. The evidence of the meetings of the officers of petitioner to determine how to proceed with the exploitation of the process they had developed clearly indicates that the development period of the process, as distinguished from the continuing development that would go forward during its commercialization, had been completed. We do not view our conclusion in this regard as an attempt to segment one phase of "construction" from the total "construction" of a project which we held in *Sproul Realty Co., supra* at 859, to be improper. In concluding that the preliminary activities which we held to constitute construction could not be separated from proceeding with the construction of the buildings, we stated:

From its inception the "construction" undertaken by petitioner was not merely the rezoning of the shopping center' site and the leasing of the intended buildings but included the actual physical construction of the shopping center and all the land improvements involved therein. Although petitioner agreed on

September 21, 1956, to sell its interest in the project prior to the start of physical construction of the shopping center, the sales agreement provided that petitioner was responsible for completing such physical construction and that it would not receive the stipulated consideration for the site until such physical construction had been completed. Petitioner was in fact paid in September 1957, when the construction of the shopping center was completed. Thus, it is clear that petitioner's decision to sell the shopping center and liquidate the corporation was made almost a full year prior to the completion of the construction of the shopping center. In these circumstances, there existed the requisite "view" to a distribution to petitioner's shareholders *before* the completion of construction, and the *Jacobson, Temkin,* and *Riley* cases are therefore inapplicable. Sec. 1.341-2(a)(2) and (3), Income Tax Regs.; cf. *Ellsworth J. Sterner, supra* at 1148; *Jack Farber, supra* at 1155-1158.

Here, what petitioner had done by mid-April 1965 is more comparable to completion of the construction of a real estate project and what was done thereafter more comparable to the management of the project after tenants have begun to move in and it is necessary to make certain changes or alterations for their convenience from time to time.

Since the determination of when the production of an intangible asset is complete and the exploitation of that intangible asset has commenced is a question of fact to be determined in each case, we must make our determination here on all the facts in this case. In our view, under these facts, petitioner had completed the production of its computer program prior to the time it formed the view to transfer that program to a corporation in which petitioner would sell a portion of the stock it received in return for the transfer. In our view the computer program developed or produced by petitioner had passed the development state and was ready for exploitation when the view to sell an interest in the corporation to which it would be transferred was formed which, as we have stated, at the earliest was not before April 19, 1965. We therefore conclude that Computax was not a collapsible corporation since the view to sell stock in Computax was not held by petitioner even conditionally prior to completion of production of the property, the computer program. The facts here indicate that it was petitioner's intent to market the service which would be performed by use of the computer program itself or through a corporation in which it would itself hold the stock it received for transfer of the program until after the program was developed or the production of the program completed. We therefore conclude that *Maxwell*

*Temkin, supra,* and *Charles J. Riley,* 35 T.C. 848 (1961), are applicable in the situation here present and that Computax was not a collapsible corporation.

Since we have decided, for the reasons set forth above, that Computax was not a collapsible corporation, we need not decide the issue raised by petitioner's alternative argument as to whether Computax should be held not to be a collapsible corporation because of the provisions of section 341(e).

Since certain issues in this case were disposed of by agreement of the parties,

*Decision will be entered under Rule 155.*